693 A.2d 30

Diane WOLINSKI

v.

Gary C. BROWNELLER, et ux.

No. 1353, Sept. Term, 1996.

Court of Special Appeals of Maryland.

April 30, 1997.

Motion for Reconsideration Denied on May 27, 1997.

power, and limiting the serious social consequences of poor relief assistance.

286

288

Judith A. Ringle, Dundalk, for Appellant.

Gary N. Bowen, Baltimore, for Appellees.

Argued before WENNER, DAVIS and HARRELL, JJ.

DAVIS, Judge.

Diane Wolinski appeals from a judgment of the Circuit Court for Baltimore County that affirmed a Master's written report and recommendations concerning grandparent visitation rights to Destiny, appellant's daughter. On September 12, 1995, Gary and Jane Browneller, appellees, filed an action in the circuit court in order to establish a set schedule for their visitation with their granddaughter, Destiny. Appellant also requested a court order of reasonable visitation, but requested that the order conform to her proposed schedule of visitation. Immediately after a hearing held on December 12, 1995, Master in Chancery Jacqueline D. Wyman entered an Emergency Order that granted overnight visitation rights to

the grandparents in a set schedule different than that proposed by appellant. By its terms, the Order was to expire on March 11, 1996. Appellant immediately filed exceptions to the Master's ruling, requesting an expedited hearing on the exceptions. One week later, on December 19, 1995, appellant amended her exceptions, asserting that the Order violated appellant's Fourteenth Amendment privacy rights and that the Master erred in excluding testimony on prior efforts to establish reasonable visitation hours for appellees. Appellant also filed a motion to stay the ordered visitation pending a ruling on the exceptions.

On December 21, 1995, the court filed an Emergency Pendente Lite Order that granted appellees visitation rights according to the terms set forth in the Master's recommendations. On January 14, 1996, the circuit court granted appellant's motion to stay the execution of the Order.[1] The court held a hearing on the exceptions on February 2, 1996. By a Memorandum Opinion and Order filed on March 7, 1996, the court affirmed the Master's findings and recommendations.

The Order expired on March 11, 1996. On March 12, appellant filed a Motion to Amend or Alter the Judgment under MD.RULE 2–534 (1996), pointing out that the Master recommended mediation by the parties through the Custody and Mediation Division of the circuit court. In a ruling filed on April 3, 1996, the circuit court approved this recommendation and granted appellant's motion, ordering the parties to proceed with mediation "in due course." The court ordered the visitation schedule set by the Master, including the overnight visitation, to continue in place pending the recommendations of the Custody and Mediation Division. The chancellor

---

1. Appellant challenges the Master's and the circuit court's authority to enter and enforce an emergency order when exceptions were timely filed. We need not examine this issue. Because the court stayed the enforcement of the order pending the outcome of the hearing on the exceptions, any error in this regard was rendered harmless.

issued another order on May 22, 1996, denying appellant's second motion to stay the visitation order.[2]

On April 3, 1996, appellant filed her notice of appeal from the judgment of the circuit court entered on March 7, 1996. Appellant amended her notice of appeal on April 11, 1996, acknowledging the receipt of the chancellor's April 3 ruling.[3] Appellant presents three questions for our review, which we restate as follows:

I. Did the chancellor err by not applying a presumption that appellant's proposed schedule of visitation was in Destiny's best interests?

II. Did the chancellor abuse his discretion by failing to consider testimony that overnight visitation was harmful to Destiny?

III. Did the chancellor abuse his discretion in refusing to allow testimony concerning post-complaint visitation by appellees?

We answer in the affirmative to the first question, we do not reach the second, and we answer the third in the negative. We vacate the chancellor's decision and remand.

## FACTS

Destiny was born on March 4, 1994. Destiny's father, Nicholas Browneller, joined the U.S. Navy and left home in September 1994. Before Nicholas joined the Navy, appellees received overnight visits from Destiny every other weekend, from Saturday to Sunday afternoon.[4] Appellant testified at

---

**2.** The record does not disclose the ultimate outcome, if any, of the mediation. Thus, we are unable to determine if appellant's challenge to the court-ordered visitation schedule is moot. We must assume that the schedule is still in force.

**3.** The parties filed numerous motions after the notice of appeal. We need not detail the procedural history of this case after the notice of appeal was filed, however.

**4.** In her brief, appellant states that Destiny spent one night every weekend with appellees during this period. Appellant testified at the

the hearing before the Master that Destiny "would come home irritable and cranky and more clingy to me" after these visits.

Nicholas came home for Christmas on December 24, 1994. He left again on January 9, 1995. He, appellant, and Destiny were together during that period; appellant testified that appellees saw Destiny almost daily at this time, including during Christmas. After Nicholas returned to duty on January 9, appellees' previous visitation schedule resumed until March 1995.

On an unspecified day in March, Destiny was visiting appellees at their home. Appellant called appellees and requested that they return Destiny to her by 1:30 p.m. so that appellant could take Destiny to a baby shower for a friend. Appellees said that they were planning to take Destiny out to dinner until 3:00 p.m. and that they would call appellant when they returned.[5] Appellant called the police, and appellees returned Destiny to appellant at 1:30 p.m. From that day in March until the end of May 1995, appellant allowed visitation by appellees only in appellant's home.

Appellees claim that the incident in March was not the real reason for the disruption of overnight visitation. They claimed that Nicholas "broke up" with appellant in that month. From that point on, appellees alleged, appellant used Destiny as a "pawn" to strike at Nicholas and his parents. This manipulation allegedly intensified after September 1995, when Nicholas allegedly returned to his parents' home with a new girlfriend. Appellees allege that in that month, appellant announced that she intended to deny appellees and Nicholas all visitation. Appellees assign blame for the problems with

hearing before the Master, however, that Destiny spent one night every *other* weekend with her grandparents. This conflict in the record is ultimately unimportant because in her Answer to the Complaint, appellant admitted that appellees had developed a warm and loving relationship with Destiny.

5. Appellant contends in her brief that Jane Browneller told her that they would return Destiny "when she felt like it." The record does not support this assertion, and we are at a loss to explain how appellant gleaned this fact from the testimony.

overnight visitation, then, to petty jealousy and intransigence on appellant's part.

On May 12, 1995, appellant sent to appellees a handwritten proposal that appellees would have visitation, at their home, with Destiny for eight hours a day on every other Saturday and Sunday. Appellees agreed to this by signing the proposal and sending it back to appellant on May 26, 1995. Until September, regular visitation occurred as previously agreed. Appellant claims that Destiny was irritable, cranky, and "overly clingy" to her mother after each visit.

On September 4, 1995, appellees took Destiny out of the State (in contravention of the agreement) to pick up her father at D.C. National Airport when he arrived on leave from the Navy. Afterward, according to appellant, Destiny was terrified and developed pneumonia later in the week. Appellant also testified that Nicholas threatened her life over the telephone during his time at home, causing her to obtain a restraining order against him. As noted *supra*, appellees maintain that appellant was furious when Nicholas brought home a new girlfriend. The parties hold fast to their respective versions of events; appellant claims to have extended an invitation to the Brownellers and Nicholas to visit Destiny at appellant's home, and appellees claim that appellant announced that she intended to deny appellees and Nicholas all visitation. For purposes of this appeal, events culminated with the filing of the Complaint on September 12, 1995.

## ANALYSIS

MARYLAND CODE (1984, 1996 Supp.), § 9–102 of the FAMILY LAW ARTICLE (F.L.) reads as follows:

An equity court may:

(1) consider a petition for reasonable visitation of a grandchild by a grandparent; and

(2) if the court finds it to be in the best interests of the child, grant visitation rights to the grandparent.

*Id.* The Court of Appeals has interpreted the permissive language of the statute as investing the chancellor with discre-

tion to award visitation according to the facts and circumstances of each case. "The statute's use of the word 'may,' rather than 'shall,' signifies that the steps prescribed in § 9-102 are available, but not mandatory; such is the ordinary and natural import of the word." *Fairbanks v. McCarter*, 330 Md. 39, 46, 622 A.2d 121 (1993).

A Master's findings of fact are merely tentative and do not bind the parties until approved by the court. *Doser v. Doser*, 106 Md.App. 329, 343, 664 A.2d 453 (1995). Upon due consideration of the facts found by the Master, "the court may use the master's facts to support what *it* concludes in its independent judgment is the optimal resolution." *Id.* Consequently, our task on review is to determine whether the chancellor abused his discretion in his award of visitation. *See Beckman v. Boggs*, 337 Md. 688, 703, 655 A.2d 901 (1995).

### A

Appellant first challenges the constitutionality of the chancellor's application of the grandparent visitation statute. She forgoes a constitutional challenge to the legislature's authority to mandate grandparent visitation against a parent's wishes; conceding that the chancellor possessed constitutional and statutory authority to award visitation to appellees, appellant chooses a more sharply defined ground upon which to fight. She argues that the Fourteenth Amendment mandates applying a rebuttable presumption that her proposed *schedule* of visitation was in Destiny's best interests. This presumption, appellant argues, is rebuttable only by evidence that the schedule would be harmful or neglectful of Destiny. By failing to apply the presumption in setting the schedule of appellees' visitation with Destiny, appellant concludes, the Master and the chancellor violated appellant's Fourteenth Amendment liberty interest to be free from excessive governmental interference in matters of child-rearing.

We note at the outset that appellant does not base her claim on the language of the statute or the intent of the General Assembly in passing the Grandparent Visitation Act.

In fact, conspicuously absent from her argument is any suggestion that the statute, by expression or implication, mandates a rebuttable presumption that a parent's wishes regarding visitation schedules are in the child's best interests. Appellant's silence on this issue allows us to presume that the statute contains no such requirement on its face. MD. RULE 8–131(a) (1997) (issue not raised in or decided by the trial court not preserved for appellate review). Moreover, as we explain *infra*, the statute does not indicate a clear intention that such a presumption should apply.

# I

Beginning with *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) and *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), the Supreme Court, in a variety of contexts, has recognized that freedom of personal choice in matters of marriage, family life, and the upbringing of children is a liberty interest protected by the Fourteenth Amendment.[6] *See M.L.B. v. S.L.J.*, —— U.S. ——, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (termination of parental rights); *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (same); *Parham v. J.R.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (right to care for mental health of child); *Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (right to marry); *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (right of extended family to live together); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (right to abortion); *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (right to direct children's education, coupled with right to freedom of religion); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (right to raise children); *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct.

---

**6.** The Maryland Declaration of Rights carries the same meaning as the Fourteenth Amendment. Thus, analysis applicable to the latter applies to the former. *Wagner v. Wagner*, 109 Md.App. 1, 23 n. 9, 674 A.2d 1, *cert. denied*, 343 Md. 334, 681 A.2d 69 (1996).

1274, 20 L.Ed.2d 195 (1968) (access to contraceptives; right to define the family); *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (right to allow child to work); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (right to direct upbringing and education of children); *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923) (announcing the liberty interest "to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home, and bring up children.").

Within the narrower context of the parent-child relationship, the Supreme Court has deemed the right to rear a child "essential," *id.*, and encompassed within a parent's "basic civil rights." *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942). Maryland has consistently echoed the Supreme Court, declaring a parent's liberty interest in raising a child a fundamental one that cannot be taken away unless clearly justified. *In re Adoption/Guardianship No. 10941*, 335 Md. 99, 112, 642 A.2d 201 (1994); *In re Adoption/Guardianship Nos. CAA 92–10852 & CAA 92–10853*, 103 Md.App. 1, 12, 651 A.2d 891 (1994) ("This right is in the nature of a liberty interest that has long been recognized and protected under the state and federal constitutions."). In *In re Adoption/Guardianship No. 10941*, the Court. of Appeals quoted with approval from Justice Blackmun's dissent in *Lassiter v. Department of Social Servs.*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981):

> At stake here is "the interest of a parent in the companionship, care, custody, and management of his or her children." This interest occupies a unique place in our legal culture, given the centrality of family life as the focus for personal meaning and responsibility. "[Far] more precious ... than property rights," parental rights have been deemed to be among those "essential to the orderly pursuit of happiness by free men ...".

*Id.* at 38, 101 S.Ct. at 2165 (citations omitted), *quoted in In re Adoption/Guardianship No. 10941*, 335 Md. at 113, 642 A.2d 201. *See also In re Adoption/Guardianship No. 93321055/*

*CAD,* 344 Md. 458, 491, 687 A.2d 681 (1997); *In re Matthew R.,* 113 Md.App. 701, 720–22, 688 A.2d 955 (1997); *Coffey v. Dep't of Social Servs.,* 41 Md.App. 340, 357, 397 A.2d 233 (1979).

Concerning the rights of parents to make important decisions for their children, the Supreme Court has said:

> It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. And it is in recognition of this that [our] decisions have respected the private realm of family life which the state cannot enter.

*Prince,* 321 U.S. at 166, 64 S.Ct. at 442 (citation omitted). *See also* Ellen Canacakos, *Joint Custody as a Fundamental Right, in* JOINT CUSTODY AND SHARED PARENTING 223, 226 (Jay Folberg, ed. 1984) (characterizing the right of parental autonomy as "the right to participate in the basic decisions that affect the life, future, and welfare of one's children."). "Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children." *Parham,* 442 U.S. at 602, 99 S.Ct. at 2504. A parent's Fourteenth Amendment liberty interest in raising his or her children as she sees fit, without undue interference by the State, has long been a facet of that private realm of family affairs over which the Supreme Court has draped a cloak of constitutional protection. *M.L.B.,* —— U.S. at ——, 117 S.Ct. at 564–65.

The Court has upheld parental authority to have their children taught in languages other than English. *Meyer,* 262 U.S. at 399, 43 S.Ct. at 626–27. It has sustained parents' authority to provide religious with secular schooling against State requirements of public school attendance. *Pierce,* 268 U.S. at 534–35, 45 S.Ct. at 573–74. It has affirmed a parental liberty interest in encouraging and guiding their children's religious beliefs. *Compare Prince,* 321 U.S. at 165–66, 64 S.Ct. at 441–42 (upholding, in the face of this parental right, a State law restricting child labor) *with Yoder,* 406 U.S. at 235–

36, 92 S.Ct. at 1543–44 (overturning a mandatory schooling law in the face of Amish claims of parental authority and religious liberty).[7] *See also id.* at 233, 92 S.Ct. at 1542 (declaring *Pierce* a "charter of the rights of parents to direct the religious upbringing of their children."). The Court has recognized the parental authority over children even as it upheld a State law limiting the availability of sex materials to minors, *Ginsberg v. New York,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), and even as it invalidated a law requiring a minor to get her parent's consent for an abortion during the first trimester of pregnancy. *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976).

The Supreme Court has emphasized, however, that "rights of parenthood are [not] beyond limitation," *Prince,* 321 U.S. at 166, 64 S.Ct. at 442, and that the "state has a wide range of power for limiting parental freedom and authority in things affecting a child's welfare. . . .". *Id.* at 167, 64 S.Ct. at 442. Thus, a parent's right to direct his or her child's upbringing is not absolute. Rather, Due Process analysis requires the delicate balancing of all of the competing interests involved in the litigation. *See, e.g., City of Akron v. Akron Center for Reproductive Health,* 462 U.S. 416, 427, 103 S.Ct. 2481, 2490–91, 76 L.Ed.2d 687 (1983) (balancing individual's rights against the State's interest in regulating abortion); *Yoder,* 406 U.S. at 221, 92 S.Ct. at 1536 (balancing individual religious freedom and parental autonomy against the State's interest in preparing citizens to be self-reliant participants in society). In the context of most family law disputes over children, the State's interest is to protect the child's best interests as *parens patriae*—a derivation of the State's interest in protecting the health, safety, and welfare of its citizenry. *See e.g., Santosky,* 455 U.S. at 766, 102 S.Ct. at 1401–02; Judith L. Shandling, Note, *The Constitutional Constraints on Grandparents' Visitation Statutes,* 86 COLUM.L.REV. 118, 129 (1986) ("The state's power to intervene . . . is derived from its

---

7. In *Prince,* the child was being raised by her aunt.

*parens patriae* power, which allows the state to act when the welfare of an individual who lacks the capacity to protect her own best interests . . . is at stake.").

 The importance of those State interests that successfully override parental autonomy in raising children measures triumphantly against the nature of the individual liberty interests upon which the State laws or regulations impinge. A regulation or law significantly curtailing a fundamental right must undergo strict scrutiny—it must be narrowly tailored to serve a compelling public interest. *Roe,* 410 U.S. at 155, 93 S.Ct. at 727–28. Restrictions upon rights not deemed fundamental need only be rationally related to some purpose within the competency of the State. *See Yoder,* 406 U.S. at 233, 92 S.Ct. at 1542. Finally, there are those restrictions upon rights deemed "substantial," though not fundamental, that must undergo intermediate-level scrutiny—governmental interference is sanctioned only when the interference is supported by a substantial governmental interest. *See Plyler v. Doe,* 457 U.S. 202, 217–18, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982); *Halderman v. Pennhurst State Sch. & Hosp.,* 707 F.2d 702, 709 (3d Cir.1983).

 As noted above, the State's interest in all custody, adoption, and visitation disputes is to protect the best interests of the child caught in the middle of the fight. The Court of Appeals has often reaffirmed that this interest takes precedence over the fundamental right of a parent to raise his or her child. *See In re Adoption/Guardianship No. 10941,* 335 Md. at 113, 642 A.2d 201 ("We have made clear . . . that the controlling factor in adoption and custody cases is not the natural parent's interest in raising the child, but rather what best serves the interest of the child."). *See also Beckman,* 337 Md. at 703 n. 7, 655 A.2d 901 (visitation and custody determinations are governed by the "same principles," as visitation is considered to be a form of temporary custody). The courts have said time and again that the best interest standard is dispositive in custody awards. *See Taylor v. Taylor,* 306 Md. 290, 303, 508 A.2d 964 (1986) (best interest of the child

standard is of "paramount concern" in any custody case); Wagner, 109 Md.App. at 38, 674 A.2d 1. In the context of adoption cases, the Court of Appeals has labeled "compelling" the State's interest in securing permanent homes for children placed into its custody because of an inability or unwillingness of their parents to care for them properly. *In re Adoption/Guardianship No. 93321055/CAD,* 344 Md. at 492, 495, 687 A.2d 681. Thus, we have no difficulty classifying the "best interests of the child" standard in visitation rights disputes as a compelling State interest.

▇▇▇ The other side of the coin is, of course, the character of the opposing parental interest. The right of a parent to retain the care, custody, and management of his or her child is indeed fundamental. *Id.* at 491, 687 A.2d 681; *In re Matthew R.,* 113 Md.App. at 720–22, 688 A.2d 955. Thus, the right cannot be taken away without clear justification. *See In re Adoption/Guardianship No. 10941,* 335 Md. at 112, 642 A.2d 201. Nevertheless, we are uncertain as to the character of the parental right at stake when the issue involves visitation rights rather than custody or the termination of parental rights. In visitation disputes, the right at stake is not that of the parent to raise the child *vel non,* but to raise the child entirely as he or she wishes—to direct the child's upbringing completely. As one commentator phrased it:

> Since the rights protected are rights to control or at least participate in certain decisions affecting one's children, the rights may properly be regarded as part of a person's autonomy—the right to participate in the control of important parts of one's destiny through one's own choices. The right of family autonomy is thus a right of individual parental autonomy.

Canacakos, *supra,* at 231. It has been suggested that the distinction between the rights at stake in visitation disputes and those at stake in custody or termination proceedings bear directly on the character of the liberty interest. *See Halderman,* 707 F.2d at 708–09 (arguing that *Parham* indicates that the parental right to have child voluntarily committed is not

fundamental). *But see Michael v. Hertzler*, 900 P.2d 1144, 1147 (Wyo.1995) (holding the right to direct the association of the family a fundamental right).[8]

We need not decide today the strength of the parental liberty interest at stake here; the particular circumstances of this case do not require it. We will assume, *arguendo*, that appellant's liberty interest in directing the times her daughter will visit with her grandparents is a fundamental right. Nevertheless, even when the individual liberty interest at stake is fundamental, strict scrutiny may not be appropriate. We hold that it is not appropriate here and, for reasons explained *infra*, we will apply a rational relationship test to the court's application of the statute.[9]

## II

When choosing the analytical framework for each case, the degree of State infringement upon a fundamental right is important and, in many cases, dispositive. In her dissent in *City of Akron*, Justice O'Connor emphasized the importance of this consideration:

---

8. The *Michael* Court noted that the right to associate with one's family was a fundamental right under the Wyoming constitution. *Michael*, 900 P.2d at 1149. The rights at issue in grandparent visitation have been described as both the right of parents to direct the upbringing of their children, and the competing rights of parents and grandparents to "define" the family—to "associate." *See* Shandling, *supra*, at 129. This definitional interest was at stake in *Moore*, in which a housing ordinance effectively barred a grandmother from living with her grandson:

> [T]he prominence of other than nuclear families among ethnic and racial minority groups, including our black citizens, surely demonstrates that the "extended family" pattern remains a vital tenet of our society. It suffices that in prohibiting this pattern of family living as a means of achieving its objectives, appellee city has chosen a device that deeply intrudes into family associational rights that historically have been central, and today remain central, to a large proportion of our population.

*Moore*, 431 U.S. at 510, 97 S.Ct. at 1941 (Brennan, J., concurring).

9. The manner in which we adopt minimum scrutiny as the appropriate standard for constitutional review eliminates any need to decide the character of the parental right.

[N]ot every regulation the State imposes must be measured against the State's compelling interests and examined with strict scrutiny . . .

The requirement that state interference "infringe substantially" or "heavily burden" a right before heightened scrutiny is applied is not novel in our fundamental-rights jurisprudence, or restricted to the abortion context. In *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 37–38, 93 S.Ct. 1278, 1298–1300, 36 L.Ed.2d 16 (1973), we observed that we apply "strict judicial scrutiny" only when legislation may be said to have " 'deprived,' 'infringed,' or 'interfered' with the free exercise of some such fundamental right or liberty." If the impact of the regulation does not rise to the level appropriate for our strict scrutiny, then our inquiry is limited to whether the state law bears "some rational relationship to legitimate state purposes." *Id.* at 40, 93 S.Ct. at 1300. Even in the First Amendment context, we have required in some circumstances that state laws "infringe substantially" on protected conduct, *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539, 545, 83 S.Ct. 889, 893, 9 L.Ed.2d 929 (1963), or that there be "a significant encroachment upon personal liberty," *Bates v. City of Little Rock*, 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480 (1960).

*City of Akron*, 462 U.S. at 461–62, 103 S.Ct. at 2508–2509. *See also Planned Parenthood*, 505 U.S. at 876, 112 S.Ct. at 2820 (plurality opinion) (applying undue burden test to determine constitutionality of State infringement on women's right to an abortion); *Webster v. Reproductive Health Servs.*, 492 U.S. 490, 509, 109 S.Ct. 3040, 3051–52, 106 L.Ed.2d 410 (1989) (holding State's refusal to fund abortions does not unduly burden women's right to have abortions). In an earlier case, the Court had stated:

By reaffirming the fundamental character of the right to marry, we do not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations that do not signifi-

cantly interfere with decisions to enter into the marital relationship may legitimately be imposed.

*Zablocki,* 434 U.S. at 386, 98 S.Ct. at 681.

■■■ Notwithstanding that visitation may be characterized as a form of "temporary custody," *see Beckman,* 337 Md. at 703 n. 7, 655 A.2d 901, the respective proceedings for termination of parental rights/adoption, custody, and visitation vary greatly in their degree of intrusiveness upon the liberty interests of the parents involved. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky,* 455 U.S. at 759, 102 S.Ct. at 1397. Regarding adoption decrees, the Court of Appeals has said:

> [A]doption decrees cut the child off from the natural parent, who is made a legal stranger to his offspring. The consequences of this drastic and permanent severing of the strongest and basic natural ties and relationships has led the Legislature and this Court to make sure, as far as possible, that adoption shall not be granted over parental objection unless that course clearly is justified. The welfare and best interests of the child must be weighed with great care against every just claim of an objecting parent.

*Walker v. Gardner,* 221 Md. 280, 284, 157 A.2d 273 (1960).

Custody determinations, on the other hand, are less intrusive of parental rights than adoption or termination of parental rights proceedings, as the Supreme Court recently noted in *M.L.B.:*

> [W]e have repeatedly noticed what sets parental status termination decrees apart from ... other domestic relations matters such as divorce, paternity, and child custody. To recapitulate, termination decrees "work a unique kind of deprivation." In contrast to matters modifiable at the parties' will or based on changed circumstances, termination adjudications involve the awesome authority of the State "to destroy permanently all legal recognition of the parental relationship." Our *Lassiter* and *Santosky* decisions, recognizing that parental termination decrees are among the

most severe forms of state action, have not served as precedent in other areas.

*M.L.B.,* —— U.S. at ——, 117 S.Ct. at 570 (citations omitted). Finally, in a holding particularly pertinent to the case *sub judice,* the Court of Appeals has noted that visitation awards are less intrusive than custody awards:

> Custody disputes and visitation disputes should be measured by their respective standards. Visitation is a considerably less weighty matter than outright custody of a child, and does not demand the enhanced protections ... that attend custody awards.

*Fairbanks,* 330 Md. at 48, 622 A.2d 121. Thus, the Court reasoned, grandparents need demonstrate no "exceptional circumstances" in order to win visitation rights, as they must to gain permanent custody of a grandchild. *Id.* The level of the infringement on the parental right at stake depends on the particular type of proceeding and, in its turn, affects the protection constitutionally due the parents.

 An examination of the infringement on appellant's rights in the case *sub judice* persuades us that the application of the statute should not undergo strict constitutional scrutiny, particularly given the circumstances under which appellant asserts her parental rights. We note first that several States have considered the constitutionality of their respective grandparent visitation statutes. Of those State courts that have, several have characterized these statutes as minimal infringements upon the parents' liberty interest in raising their children without excessive government interference. *See, e.g., Campbell v. Campbell,* 896 P.2d 635, 642 (Utah.Ct.App.1995); *Roberts v. Ward,* 126 N.H. 388, 493 A.2d 478, 482 (1985); *Herndon v. Tuhey,* 857 S.W.2d 203, 209 (Mo.1993) (declaring visitation rights by grandparents to be "less than a substantial encroachment on a family."); *King v. King,* 828 S.W.2d 630, 632 (Ky.), *cert. denied,* 506 U.S. 941, 113 S.Ct. 378, 121 L.Ed.2d 289 (1992) (grandparent visitation does not "go too far in intruding into the fundamental rights of the parents."); *R.T. & M.T. v. J.E. & L.E.,* 277 N.J.Super. 595, 650 A.2d 13,

14 (Ch.Div.1994). *See also Brooks v. Parkerson,* 265 Ga. 189, 454 S.E.2d 769, 779 (1995) (Benham, J., dissenting). Consequently, these States have tended to apply rational basis review to the grandparent visitation statutes. *See, e.g., Campbell,* 896 P.2d at 644 (statute "rationally related to furthering a legitimate state interest."); *Herndon,* 857 S.W.2d at 208–09 (citing *Akron,* 462 U.S. at 461–63, 103 S.Ct. at 2508–10); *King,* 828 S.W.2d at 632. *But see Michael,* 900 P.2d at 1150–51 (applying strict scrutiny test; statute was narrowly drawn in furtherance of compelling State interest in protecting child's best interests). *See also* Shandling, *supra,* at 129 (advocating strict scrutiny test).

In all of the cases we have reviewed, the challenge was to the constitutionality of allowing the grandparents to petition for, and the court to grant, visitation rights *ab initio.* Because appellant, by not challenging the application of F.L. § 9–102, surrenders voluntarily her liberty interest in being free to deny grandparental visitation, the intrusion upon her parental autonomy to which she objects is less severe than in the cases cited *supra.* Although a court's imposition of a particular *schedule* of visitation does present some intrusion upon her right to raise her child as she sees fit, it intrudes upon a very small fraction of that autonomy; and it certainly does not intrude to the same extent as the decision to override parental objection to *any* visitation. The sum of a child's life is composed of more than the time spent with his or her grandparents. And in this case, appellant essentially objects only to the grant of overnight visitation rights, as opposed to daytime visitation only. Indeed, an intrusion into parental autonomy is present—but it is relatively small compared to that suffered by the unsuccessful appellants in *Campbell, Roberts, Herndon,* and *King.* Strict scrutiny is therefore not appropriate. Our examination of the relevant case law convinces us to apply a rational basis test to this particular intrusion.[10]

---

**10.** Because appellant does not challenge the facial constitutionality of F.L. § 9–102, we leave open the question of whether the rational basis

## III

Because appellant concedes that the Master could have ordered some form of grandparent visitation, we will assume that F.L. § 9–102 is facially constitutional. Appellant frames her argument as a challenge to the application of the statute, not its validity. The Master and the circuit court, she contends, were constitutionally obligated to presume that her proposed schedule of visitation is in Destiny's best interests. This presumption must stand, appellant concludes, if appellees do not present some evidence that the schedule would be harmful to or neglectful of Destiny's best interests.

The statute itself contains no language expressly mandating such a presumption. A review of the available legislative history likewise reveals no intent to presume a custodial parent's wishes on visitation schedules to be in the best interests of the child. Nevertheless, neither the statutory language nor the legislative history indicates that the General Assembly intended that such a presumption *not* apply. Rather, the only clear and unequivocal standard enunciated in the case law, the statute, and the legislative history is that the finder of fact must exercise his or her discretion for the sole purpose of furthering the best interests of the child. F.L. § 9–102(2); *Beckman,* 337 Md. at 693, 655 A.2d 901 ("In [deciding whether to award visitation] the court must focus exclusively on the welfare and prospects of the child."); *Fairbanks,* 330 Md. at 49, 622 A.2d 121 ("The outcome of the grandparents' petition lies within the sound discretion of the trial court, guided solely by the best interests of the grandchild."). *See also* John A. Pica, Jr., Testimony on Behalf of HB 1205 Before the House Judiciary Committee (March 22, 1979):

In HB 1205 grandparents *are not* automatically deemed a group to be considered in the awarding of visitation rights.

---

test applies to the General Assembly's enactment of F.L. § 9–102, noting only that the investiture of visitation rights would seem to intrude somewhat more severely upon parental autonomy than does setting a schedule of visitation.

They are, however, a category that *may* be considered for visitation rights. And once they are considered, they may only be awarded the rights if it is in the best interest of the child.

. . .

Again, let me stress Mr. Chairman that this legislation is designed to address the best interest of the child.

*Id.*

 Nevertheless, recognizing the dispositive nature of the "best interests of the child" standard begs the question of what schedule of visitation would actually *be* in the child's best interests. The statute and case law grant to the trial judge wide discretion to make this determination. *Maner,* 342 Md. at 469, 677 A.2d 560; *Beckman,* 337 Md. at 703, 655 A.2d 901 ("As we have said, determinations concerning visitation are within the sound discretion of the trial court as it is in the best position to assess the import of the particular facts of the case and to observe the demeanor and credibility of the witnesses."). We must determine, therefore, if the chancellor abused his discretion in not applying a presumption in favor of appellant's schedule of visitation. *See Maner,* 342 Md. at 469, 677 A.2d 560; *Petrini v. Petrini,* 336 Md. 453, 470, 648 A.2d 1016 (1994).

 For purposes of our analysis, we will assume, *arguendo,* that the statute does *not* require this presumption, but leaves the matter entirely to the trial judge's discretion. Appellant's challenge, therefore, would be to the constitutionality of the statute—a statute that does not mandate a presumption in favor of the parent's schedule of visitation. Our characterization of the statute in this manner facilitates constitutional analysis; of course, we presume that the legislature intended the statute to be constitutionally sound, and we will interpret the statute in such a way as to save it from constitutional infirmity, if our interpretation does not distort the meaning of the statute's plain language. *See Tidewater/Havre de Grace, Inc. v. Havre de Grace,* 337 Md. 338, 352, 653 A.2d 468 (1995).

## IV

The Supreme Court has placed its imprimatur on the presumption that parents act in the best interests of their children. In *Parham,* the parents of a minor child wanted the child committed to a State mental hospital. The Court balanced the three interests involved—the parents' interest in their autonomy to rear the child, the child's interest in not being confined unnecessarily for medical treatment, and the State's interest both in confining the use of its mental health facilities to those in genuine need, and in not imposing significant obstacles to those who need medical treatment. The Court noted that in most cases, "the child's interest is inextricably linked with the parents' interest in and obligation for the welfare and health of the child...." *Parham,* 442 U.S. at 600, 99 S.Ct. at 2503. Explaining the basis for this conclusion, the Court stated:

> The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. *More importantly, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.*

*Id.* at 602, 99 S.Ct. at 2504 (emphasis added). The Court concluded:

> In defining the respective rights and prerogatives of the child and parent in the voluntary commitment setting, we conclude that our precedents permit the parents to retain a substantial, if not the dominant, role in the decision, absent a finding of neglect or abuse, and that *the traditional presumption that the parents act in the best interests of their child should apply.*

*Id.* at 604, 99 S.Ct. at 2505 (emphasis added).

We note, however, that *Parham,* although it imposed a presumption in favor of the parent's wishes for his or her child, is not controlling in the case *sub judice.* First, the Court at that point in the case was balancing the rights of the parents to raise their child as they see fit with the rights of

the child in not being unnecessarily committed. When it factored in the rights of the State—both as *parens patriae* and as a sovereign with limited resources—the Court found that a proper balance is struck between all competing interests when a "neutral fact[ ] finder" determines that the statutory requirements for admission to a mental hospital are satisfied. *Id.* at 606, 99 S.Ct. at 2506. Thus, in the analysis that led it to the presumption that parents act in their children's best interests, the *Parham* Court was not considering the State's concurrent interest in protecting the health and welfare of the child, as we must.

 Nevertheless, although *Parham* does not dictate the outcome of the case *sub judice,* the presumption enunciated within—that parents are presumed to act in their children's best interests—informs all analyses involving parental autonomy and the effect parents' wishes should have on the future of their children. In fact, recognizing that "natural bonds of affection lead parents to act in the best interests of their children," *id.* at 602, 99 S.Ct. at 2504, Maryland has adopted, in termination of parental rights, adoption, and custody proceedings, a *prima facie* presumption that a child's welfare will be best served in the care and custody of its parents rather than in the custody of others. *In re Adoption/Guardianship No. 10941,* 335 Md. at 114 n. 10, 642 A.2d 201; *Sider v. Sider,* 334 Md. 512, 530, 639 A.2d 1076 (1994); *Ross v. Hoffman,* 280 Md. 172, 178–79, 372 A.2d 582 (1977); *Ross v. Pick,* 199 Md. 341, 351, 86 A.2d 463 (1952); *Tedesco v. Tedesco,* 111 Md.App. 648, 656, 683 A.2d 1133 (1996). That presumption is overcome if opposing parties show that the natural parent is unfit to have custody, or exceptional circumstances make parental custody detrimental to the best interests of the child. *Sider,* 334 Md. at 530–31, 639 A.2d 1076; *Tedesco,* 111 Md.App. at 657, 683 A.2d 1133. As a result of the presumption's operation in custody disputes, a court will inquire into the best interests of the child only when evidence attesting to a parent's lack of fitness or to exceptional circumstances injurious to the child has been presented. *Id.* at 657, 683 A.2d 1133. Thus, in one instance, the Court of Appeals ruled that the trial court

abused its discretion when it denied a paternity petition without even considering the biological father. *Sider*, 334 Md. at 534, 639 A.2d 1076.

■ Although we recognize the common roots of the presumption that applies to custody/adoption disputes and the presumption that we announce today in grandparent visitation disputes, let it be absolutely clear that the two presumptions are *not* of equal strength. In custody and adoption proceedings, stripping the natural parents of custody or parental rights requires proof of parental unfitness or exceptional circumstances that justify overriding parental rights. *Sider*, 334 Md. at 530–31, 639 A.2d 1076. The Court of Appeals, however, has expressly disavowed any requirement that grandparents have to prove the existence of "exceptional circumstances" in order to win *visitation* rights. *Fairbanks*, 330 Md. at 48, 622 A.2d 121. Disapproving our dictum in *Skeens v. Paterno*, 60 Md.App. 48, 61, 480 A.2d 820 (1984), in which we suggested that grandparent visitation, like custody, may have to be based on exceptional circumstances, the Court of Appeals stated:

Custody disputes and visitation disputes should be measured by their respective standards. Visitation is a considerably less weighty matter than outright custody of a child, and does not demand the enhanced protections, embodied in the exceptional circumstances test, that attend custody awards.

*Fairbanks*, 330 Md. at 48, 622 A.2d 121. Thus, a court may award visitation rights to grandparents over the parents' objections even in the absence of exceptional circumstances. *Id.*

As *Fairbanks* suggests, the abrogation of the exceptional circumstances requirement in grandparent visitation matters results from the fundamental difference between custody disputes and visitation disputes. The propriety of a legal presumption in family disputes over children depends on the procedural steps necessary to protect constitutionally the interests involved—the child's, the State's, and the parents'

interests. The maxim that parents are presumed to act in their children's best interests, *Parham*, 442 U.S. at 604, 99 S.Ct. at 2505, remains undisturbed in the abstract; but the manner in which this maxim finds expression in our legal process will depend upon the caliber of the rights involved in each type of dispute and of the relative danger to those rights.

In custody and adoption disputes, the infringement upon parents' rights to raise their children, protected by the Fourteenth Amendment, is tremendous; indeed, it is often fatal to those interests. *See Walker*, 221 Md. at 284, 157 A.2d 273 ("[A]doption decrees cut the child off from the natural parent, who is made a legal stranger to his offspring."). This danger is reflected in the requirement that a child's interests are strongly presumed best served in the *care* of the natural parents, and this strong presumption is only rebutted by a finding of parental unfitness or exceptional circumstances justifying custody in or adoption by a third party. *Sider*, 334 Md. at 530–31, 639 A.2d 1076; *Tedesco*, 111 Md.App. at 657, 683 A.2d 1133. These are the "enhanced protections" of which the Court of Appeals spoke in *Fairbanks*. *Fairbanks*, 330 Md. at 48, 622 A.2d 121. Even here, however, the primary goal is to protect the best interests of the *child*, not the parent. *See In re Adoption/Guardianship No. 10941*, 335 Md. at 113, 642 A.2d 201 ("[T]he controlling factor in adoption and custody cases is ... what best serves the interest of the child.").

In the case of grandparent visitation disputes, as *Fairbanks* held, the lesser intrusion on parental rights abrogates the need for a strong presumption best suited for a strict scrutiny analysis. As we have discussed *supra*, especially when the parent, as here, does not challenge the constitutionality of the statute *per se*, but only challenges the details of its application, parental rights are adequately protected by an inquiry into whether the law is rationally related to a legitimate government interest. Nevertheless, we say again, the maxim remains—parents are presumed to act in the best interests of their children. *Parham*, 442 U.S. at 604, 99 S.Ct. at 2505. No level of constitutional scrutiny will alter that

maxim; the level of scrutiny will only determine whether a court must apply the maxim as a legal presumption in its deliberations.

## V

■ We need not decide whether F.L. § 9–102 is constitutional on its face. As noted *supra*, we are presented with a different issue: assuming the constitutionality of ordering grandparent visitation *ab initio*, does the constitution require a trial court to apply a rebuttable presumption that a parent's proposed *schedule* of visitation is in his or her child's best interests? That is, is a statute that does not require such a presumption (as we presume *arguendo* that this one does not) rationally related to the State's interest in protecting the welfare of its children by fostering beneficial relationships between grandparents and grandchildren?

We hold that it is not rationally related. It is true that a parent's proposed schedule of visitation in a given instance may not be in the child's best interests. In these cases, the chancellor has the discretion to determine that the evidence presented indicates that the child's interests would be better served by a schedule of visitation different than that proposed by the parent. Nevertheless, as the Supreme Court stated in *Parham,*

> [t]hat some parents may at times be acting against the interests of their children ... creates a basis for caution, but is hardly a reason to discard wholesale those pages of human experience that teach that parents generally do act in the child's best interests. The statist notion that governmental power should supercede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition.

*Parham,* 442 U.S. at 602–03, 99 S.Ct. at 2504 (citations omitted).

■ We can see no reasonable relationship between allowing a Master or trial court completely to ignore the views of the parent on what schedule is in his or her child's best

interests, and the State's purpose at stake—fostering meaningful relations between the grandparents and grandchild when the child will benefit from that. Appellant concedes, after all, that the grandparents should have visitation rights; thus, much of the purpose of the grandparent visitation statute is served. If a parent is obstinate or unreasonable in his or her proposal for visitation times, so that the proposal will not be in the child's best interests, then the court is free to exercise its discretion and override the parent's wishes on the matter. To ignore the parent's proposal entirely, however, serves no rational purpose and furthers no State interest, no matter how compelling. As the Supreme Court stated in *Parham,* "the traditional presumption that the parents act in the best interests of their child should apply." *Parham,* 442 U.S. at 604, 99 S.Ct. at 2505.[11] This maxim seems particularly appropriate in a situation like the one here, in which a mother testified that overnight visitation was overly disruptive to her infant daughter.

## VI

██ Our conclusion is consistent with the decision of the Court of Appeals in *Fairbanks* not to require grandparent petitioners to establish exceptional circumstances justifying visitation. As noted *supra,* the presumption announced by the Supreme Court—and which we adopt today—is not as strong as the presumption in favor of parental custody. Only evidence of parental unfitness or exceptional circumstances may override parental rights in custody and adoption cases. *Winter v. Director, Dep't of Welfare,* 217 Md. 391, 396, 143 A.2d 81

---

11. The Court in *Parham* said that the presumption could be rebutted by a "finding of neglect or abuse." *Id.* The language used by the Court in this case resulted from the voluntary commitment setting. We wish to be clear that grandparents need not present evidence that a parent's proposed schedule of visitation would physically or psychologically "neglect" or "abuse" their grandchild in order to override the parent's schedule. Rather, "[t]he grandchild's best interest is paramount." *Fairbanks,* 330 Md. at 49, 622 A.2d 121. As discussed *infra,* the chancellor need only find evidence that the parent's proposed schedule of visitation would not be in the best interests of the child.

(1958). The existence of exceptional circumstances depends on the facts and circumstances of each case. *In re Adoption/Guardianship No. A91–71A*, 334 Md. 538, 561, 640 A.2d 1085 (1994).

An example of the type of behavior or situation found relevant to the existence of "exceptional circumstances" is the desertion by a father of the mother during pregnancy without regard for her prenatal care or concern, coupled with the extreme instability of the father. *Id.* at 563–64, 640 A.2d 1085. Even so, the Court noted, "The mere presence of any of these factors may not warrant a finding of exceptional circumstances justifying the termination of parental rights...." *Id.* at 564, 640 A.2d 1085. Exceptional circumstances have been found to exist and to justify awarding custody of a child to her maternal grandparents when the eight-year-old child had lived with her grandparents since the age of four months and was receiving the care and affection of a mother from her grandmother. *Piotrowski v. State*, 179 Md. 377, 383, 18 A.2d 199 (1941). In *Ross*, the Court of Appeals noted:

> The factors which emerge from our prior decisions which may be of probative value in determining the existence of exceptional circumstances include the length of time the child has been away from the biological parent, the age of the child when care was assumed by the third party, the possible emotional effect on the child of a change in custody, the period of time which elapsed before the parent sought to reclaim the child, the nature and strength of the ties between the child and the third party custodian, the intensity and genuineness of the parent's desire to have the child, the stability and certainty as to the child's future in the custody of the parent.

*Ross*, 280 Md. at 191, 372 A.2d 582.

When the Court of Appeals in *Fairbanks* rejected any need for exceptional circumstances justifying grandparental visitation, its decision rested upon the minimal intrusion into parental rights that visitation awards pose. That decision does not affect our conclusion in this case, for the presumption mandat-

ed by the Fourteenth Amendment—that a parent's schedule of visitation is in the child's best interests—fully reflects this lesser intrusion upon parental rights. In other words, this presumption is weaker than the presumption that operates in custody or adoption disputes, and a grandparent need not present "exceptional circumstances" to rebut it. Although little case law exists to demonstrate the "low end" of what may constitute exceptional circumstances, the Court has noted that any of the *Ross* factors, taken alone, may not suffice. *In re Adoption/Guardianship No. A91–71A,* 334 Md. at 564, 640 A.2d 1085. As the legal idiom suggests, the circumstances, in the mind of a rational trier of fact, must truly be "exceptional" to justify stripping a parent of custody or parental rights. *See McClary v. Follett,* 226 Md. 436, 442, 174 A.2d 66 (1961) (despite a conviction for striking child, the record was "barren of any showing of unusual or exceptional circumstances" that would justify stripping the father of custody). In the context of visitation proceedings, the presumption in favor of a parent's proposed schedule of visitation may be overcome by evidence that, in the mind of the chancellor, indicates that the schedule would not be in the child's best interests. Exceptional circumstances need not be shown. Yet the analysis must begin with the parent's proposed schedule.

██ In addition, we do not intend to extend the presumption in favor of a parent's *schedule* of visitation to the initial decision of whether to vest grandparents with visitation rights at all. Unlike the situation in the case at bar, the decision to grant grandparent visitation *ab initio,* without applying a presumption in favor of a parent's objections, is—assuming minimal scrutiny applies to the initial award of visitation rights—rationally related to the State's interest in fostering beneficial grandparent-grandchild relationships.[12] In *Fair-*

---

**12.** Although we do not decide the constitutional validity of F.L. § 9–102, *Fairbanks's* abrogation of the grandparents' need to demonstrate exceptional circumstances strongly suggests either that the parental right involved is not fundamental, or that the statute, as applied in *Fairbanks,* serves a compelling State interest that overrides any fundamental parental right.

*banks,* the grandparents brought an action under F.L. § 9–102 because the father would not voluntarily expand the time that the children might spend with them; they wanted enforceable visitation rights of their own. *Fairbanks,* 330 Md. at 43, 622 A.2d 121. The father opposed the petition entirely, claiming that the maternal grandparents enjoyed ample access to the children when they were with their mother. *Id.* Thus, the Court of Appeals held that exceptional circumstances were not required in order to vest grandparents with *enforceable visitation rights,* as opposed to relying upon the goodwill of the parents. *See id.* at 48–49, 622 A.2d 121.

▮▮▮▮ We do not read *Fairbanks* as speaking to the process to be used in deciding upon the *amount* or *kind* of visitation, but to the process to be used in cases when the parents object to *any* award of visitation rights. In cases when *any* court-ordered visitation is opposed by one or both parents, dispensing with a presumption in favor of the parents' wishes is constitutionally valid as a means of protecting the welfare of the child. In some of these cases, as in *Fairbanks,* the parent's objection is not to the child spending time with grandparents, but to grandparents having an *enforceable* right to spend time with their grandchildren. This objection collapses under its weight, for its premise is that parents should have unfettered discretion to decide whether their children should spend any time at all with their grandparents, and if so, how much. Thus, as the legislature may in substantially encroach upon this parental discretion in a rational manner, this is really no objection at all. The issue has already been decided, so to speak, and dispensing with a presumption in favor of the parents' wishes not to order visitation *vel non* is constitutional.[13]

Yet we repeat—when the parents agree to some form of court-ordered visitation, differing only as to the amount and

---

13. In those cases where the parents cut off *all* visitation to one or more grandparents, prompting a F.L. § 9–102 action, the objection likewise is to the vesting of enforceable visitation rights *per se,* and the abrogation of any presumption in favor of the parents is constitutional.

kind of visitation that would be appropriate, then the legislative purpose is not served at all by disregarding the traditional presumption that parents act in the best interests of their children. There is no reasonable link. If any doubt remains, the ability of a court to override a parent's proposed schedule of visitation (if necessary to protect the child) renders irrational the abrogation of this time-honored presumption.

## VII

In exercising its discretion under F.L. § 9–102 to award reasonable visitation rights, a court must exclusively consider the best interests of the child. *See Fairbanks,* 330 Md. at 49, 622 A.2d 121. Nevertheless, we hold that a natural parent's proposed schedule of visitation is entitled to a presumption that it is in the best interests of the child. Effectively, our ruling is very deferential to the chancellor's discretion. But proper regard for a parent's constitutional rights requires that the burden to produce testimony or other evidence discrediting a parent's proposed visitation schedule be placed upon the grandparents who petition for vested visitation rights. Simply to ignore a parent's wishes regarding the time his or her child should spend outside the family home, and outside of his or her immediate care and custody, is to trample improperly on the parent's liberty interest in directing the upbringing of his or her child. Nevertheless, in light of the State's compelling interest in protecting the child's welfare and the minimal severity of the intrusion upon parental rights, the presumption in favor of appellant's schedule may be rebutted by affirmative evidence that the schedule would be detrimental to the child's best interests. By way of illustration, not limitation, the chancellor may consider testimony by the parents and grandparents, the child's reactions to the lack of overnight visitation, the extent of previous visitation, and, in appropriate cases, the child's own wishes. We remand to the chancellor so that appellant may present a proposed schedule of visitation, and appellees may present any evidence or testimony that may indicate that appellant's schedule would not be in Destiny's best interests.

## B

As appellant herself aptly notes, "The court's job is not to evaluate the merits of the underlying dispute between the parties to a grandparent visitation proceeding, pick a winner and award the child accordingly." Rather, the focus of *all* visitation matters is the best interests of the child. To that end, we will not address appellant's argument that the Master abused her discretion in "ignoring" evidence that overnight visitation was harmful to Destiny. We will simply remand to the chancellor for an analysis consistent with our opinion.

## C

During the trial, appellant attempted to testify as to certain schedules of visitation that she offered to appellees both before and after the complaint was filed. The Master barred the testimony as relating to settlement negotiations. MARYLAND RULE 5–407 (1997) proscribes the admission of statements made in compromise negotiations or mediation if the statements are offered to prove the validity or invalidity of a civil claim in dispute. Evidence of offers made by a party to litigation of compromise is inadmissible as a matter of the public policy, which encourages settlements of disputed claims. MD.RULE 5–408(a) (1997); *Eisenberg v. Air Conditioning, Inc.,* 225 Md. 324, 338, 170 A.2d 743 (1961). Such offers of compromise may, however, be offered for purposes other than to prove the validity, invalidity, or amount of the claims at issue in a case. RULE 5–408(c).

Appellant advances two arguments in favor of the admissibility of the compromise offers. First, she claims that appellees waived any objection to the admissibility by themselves testifying as to negotiations in May 1995, by testifying to a visit with their granddaughter on September 18, 1995, and by not objecting to the introduction of the May 1995 agreement. Appellant raises this argument for the first time in her reply brief. Therefore, the argument is not properly before us on appeal, as appellees had no chance to address the argument. MD.RULE 8–504(a); *See Beck v. Mangels,* 100

Md.App. 144, 149, 640 A.2d 236 (1994). As we stated in *Federal Land Bank, Inc. v. Esham,* 43 Md.App. 446, 406 A.2d 928 (1979):

> The function of a reply brief is limited. The appellant has the opportunity and duty to use the opening salvo of his original brief to state and argue clearly each point of his appeal . . . To allow new issues or claims to be injected into the appeal by a reply brief would work a fundamental injustice upon the appellee, who would then have no opportunity to respond in writing to the new questions raised by the appellant. Due process requires that all parties have an opportunity to reply to new issues asserted against them. . . .

*Id.* at 459, 406 A.2d 928. Although, in *Federal Land Bank,* we interpreted the predecessor of RULE 8–504, the changes that were made in that rule do not affect this holding. Moreover, the due process considerations to which we alluded in *Federal Land Bank* remain unaltered despite any changes that could ever be made to the Rules. Therefore, appellant's argument that appellees had waived any objection to testimony as to settlement negotiations is not before us.

 Appellant's second argument posits that the testimony as to settlement negotiations was not offered to prove the validity or invalidity of the claim at issue in the case, which appellant, in the court below, claimed was whether her proposed level of visitation would be harmful or neglectful of Destiny. Rather, appellant argues, the excluded testimony was offered to rebut appellees' allegations that appellant withheld visitation, a matter separate from the merits of the proceeding as framed by appellant. If allowed to testify, appellant argues, she would testify that she offered through counsel to enter into an interim order that would grant the Brownellers visitation every other Sunday from 1:00 p.m. to 6:00 p.m., with exceptions for holidays; that she offered to receive the Brownellers in Destiny's home for visitation; and that she brought Destiny to the Brownellers for a short visit on Halloween 1995 so that they could see Destiny in her pumpkin costume. Appellant claims that she would also testi-

fy that she drew up the May 1995 agreement because appellee Mrs. Browneller threatened to sue her for visitation and perhaps custody of Destiny if she did not give appellees overnight visitation.

We need not address appellant's argument, for any error that the Master committed was harmless. The proposed testimony, even if collateral to the main issue, is irrelevant to appellant's statement of the claim at issue in this case— whether appellant's proposed level of visitation would be harmful or neglectful to Destiny.

Appellant offers only one argument for the proffered testimony's relevance. She states: "[I]n *Maner*, [342 Md. at 463, 677 A.2d 560], the Court of Appeals duly took note of the fact that, in the nine months between filing the complaint and the hearing, the parents permitted the children visitation with the grandparents on five occasions." From this, appellant concludes that evidence of post-complaint grandparent visitation "appears to be relevant in these sorts of matters."

We disagree. In *Maner*, the appellees had requested the denial of the petition for grandparent visitation. *Id.* Thus, the frequency of visitation granted by appellees in the absence of a court order certainly bore directly on the propriety of issuing a visitation order. In the case *sub judice*, by contrast, appellant does not question the propriety of issuing an order. She questions the amount of visitation ordered by the Master. As appellant admits, the only relevant issue then becomes, how much visitation is best for Destiny?—not whether the Master should wisely have issued an order at all. In this situation, any previous agreements or settlement discussions held by the parties are irrelevant, except to the extent that the frequency of visitation prior to the hearing has had a positive or negative effect on Destiny's well-being. The Master certainly concluded as much when she said:

> The reality is, I don't really care about settlement negotiations ... And I can't fix what's already happened and been done, okay? ... All I care about is, what's the cure going to be now? ... And [the settlement agreement is] irrele-

vant at this point because it's whatever I'm going to rule as to what the parties are supposed to do, not what they had previously agreed to. The only way that it's relevant is how it affects the best interest of the child.

The Master properly excluded circumstances surrounding any negotiations between the parties.

## CONCLUSION

On remand, the chancellor has two options—remand the case to the Master for further findings of fact and recommendations, or receive *de novo* evidence directly. *See Doser*, 106 Md.App. at 359, 664 A.2d 453. Ordinarily, it is true, the chancellor has the discretion to review the exceptions on the basis of the evidence already in the record. *Id.* The presumption we have announced today calls for specific evidentiary demonstrations by appellees, however, and it would be unfair to proceed without affording them an opportunity to marshall evidence that would rebut the presumption in favor of appellant's schedule of visitation.

Regardless of whether the court remands or hears evidence *de novo*, the chancellor has the final discretionary authority to implement a just visitation schedule. *In re Adoption/Guardianship No. 11137*, 106 Md.App. 308, 314, 664 A.2d 443 (1995).

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEES.**