897 A.2d 866

**Glen KOSHKO et ux.**

v.

**John HAINING et ux.**

**No. 1302, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

May 2, 2006.

558

Peter D. McDowell, Towson, for appellant.

Stephen J. Kleeman, Towson, for appellee.

Argued before ADKINS, KRAUSER and LAWRENCE F. RODOWSKY, (retired, specially assigned), JJ.

RODOWSKY, J.

This is a grandchildren-grandparents visitation case. The Circuit Court for Baltimore County ordered visitation with the appellees, John Haining (John) and Maureen Haining (Maureen) (sometimes collectively referred to as "Grandparents"), over the opposition to any visitation by the appellants, Glen Koshko (Glen) and Andrea Koshko (Andrea) (sometimes collectively referred to as "Parents"). Andrea is the oldest of the four children of the Hainings. Andrea is the mother of three children: Kaelyn (DOB 9/26/94), Haley (DOB 8/21/99), and Aiden (DOB 12/19/02) (the Children). Appellants contend that Maryland's Grandparent Visitation Statute (GVS), Maryland Code (1984, 2004 Repl.Vol.), § 9–102 of the Family Law Article (FL), is facially unconstitutional, or was unconstitutionally applied in this case to fit parents in an intact family.[1]

We set forth the facts in the light most favorable to the Grandparents as the prevailing parties.[2] Andrea was raised in Middleton, New Jersey. At age eighteen she left home, "to get away," together with her then boyfriend, James Atkats. They lived in Florida where Andrea became pregnant with their child, Kaelyn. James Atkats abandoned Andrea, who then returned to the Haining family home in Middleton. James Atkats has never played any role in Kaelyn's life.[3] After Kaelyn was born, Andrea and Kaelyn continued to reside in the Haining family home until 1997, when Kaelyn

---

1. FL § 9–102 reads:
   "An equity court may:
       "(1) consider a petition for reasonable visitation of a grandchild by a grandparent; and
       "(2) if the court finds it to be in the best interests of the child, grant visitation rights to the grandparent."

2. In doing so, we utilize the facts that the parties considered significant by inclusion in the Appellants' Record Extract and the Appendix of Appellees. See Maryland Rule 8–501(c) and *ACandS v. Asner,* 344 Md. 155, 189–92, 686 A.2d 250, 267–68 (1996).

3. John Haining testified that James Atkats, after his discharge from military service, sought to establish contact with Kaelyn, but John Haining dissuaded him.

was three years old. During this period, Andrea worked as a waitress in the evening, and the Hainings actively participated in the care and raising of Kaelyn. Maureen described her participation as co-parenting.

Also during this period, Andrea and Glen began dating. In September 1997, Andrea moved out of the family home, and she, Glen, and Kaelyn lived in Point Pleasant, New Jersey. Their home was about a half-hour drive from the Grandparents, and Maureen saw Kaelyn "quite often." "[A] lot of times" Maureen would take Kaelyn out for the day.

Andrea and Glen became engaged to be married. The Hainings were prepared to pay for a formal wedding, with reception, but the couple, sometime in 1998, eloped. Andrea testified that the couple were anxious to bring Kaelyn under the health insurance coverage available through Glen's employment. The couple, over time, reimbursed the Hainings for the $2,000 deposit with a catering facility that was lost when the formal wedding was cancelled.

In about June 1999, the Parents, with Kaelyn, moved to Baltimore County, Maryland in connection with Glen's employment. At that time Kaelyn was three months shy of age five. They have resided in Baltimore County ever since. Haley and Aiden were born in Maryland.

Despite the approximately 150 miles separating the two households, the Children had a close relationship with the Grandparents until October of 2003. Sometimes the Grandparents visited at the Parents' home; other times the Parents drove the Children to the Grandparents' home. The parties agree that the Children saw their maternal grandparents approximately once a month. Further, between visits, the Children and the Grandparents maintained a relationship by telephone and through cards and letters.

To evidence that the relationship continued after the Koshkos moved to Maryland, the Grandparents produced photo albums, videos, and E–Z Pass billings. The circuit court also received into evidence a log, prepared by the Grandparents, demonstrating that they visited with the Children thirty-one

times in the thirty month period between May 2001 and October 2003. These visits included two overnight stays by the Grandparents at the Parents' home and fourteen overnights at the Grandparents' home. On seven of these fourteen overnights the Children stayed without their Parents. Indeed, the Children kept toothbrushes at the Grandparents' home. The last of these Children-only visits was from October 9 to October 13, 2003, while Parents were at Glen's college homecoming in South Carolina.

In October 2003, Glen's mother was hospitalized in New Jersey with terminal cancer. She died in early December of that year. Maureen's own mother had died from cancer, and Maureen was emotional about the condition of Glen's mother. Glen did not visit his mother when one, the other, or both Parents delivered and picked up the Children in connection with the five day stay during homecoming. On the following Thursday, Maureen spoke to Andrea about this. Maureen offered to watch the Children if Parents came to New Jersey to see Glen's mother. Andrea said, " 'No, Glen is not coming up. Glen is having a birthday party.' " Maureen pointed out that Glen's mother would not live much longer and that the Parents had gone away for four days the preceding weekend. At that point Glen came on the telephone and, Maureen testified, the following conversation ensued.

> GLEN: " 'You got something to say to me?' "

> MAUREEN: " 'Yeah, I'm just concerned. [Your] mother is dying, and you're acting like an asshole.' "

> GLEN: " 'It's none of your goddamn business.... You are not going to see your fucking grandchildren again.' "

Glen slammed the phone down.

When Maureen told John of the conversation with Glen, John first spoke to Andrea, who confirmed to him what Glen had said. John then unsuccessfully attempted to reach Glen on the latter's cell phone, but left a message telling Glen that he, John, was going to come down to Maryland "to knock some sense into him[,] to crack him [in the head] that evening."

At the time of this October 2003 incident, Andrea's sister, Tracey, was engaged to be married in August 2004. Tracey planned for the Children to be part of the wedding party. On November 17, 2003, Tracey wrote to Andrea urging that Andrea at least permit the Children to participate. Tracey offered to transport them and arrange for their wedding outfits. She received no reply.

On December 12, John e-mailed Glen and Andrea, apologized for "going off the handle and wanting to 'crack'" Glen, and urged that Parents and Grandparents "sit down and talk." He said, "We Love you guys and, as you said in your Mom's eulogy Glen—life is too precious and short."

Through telephone calls and e-mails, and utilizing friends as intermediaries, Grandparents sought to restore the relationship with the Koshko family. On Valentine's Day, after being in Washington, D.C., they stopped by Parents' home, unannounced, and left gifts on the door step. They employed an attorney who wrote to the Parents on February 27, 2004, suggesting mediation. In April 2004, Parents offered to permit Grandparents to visit once with the Children, but would not commit themselves as to whether any subsequent visits could take place.

Kaelyn was nine years old, Haley age four, and Aiden about age two when the relationship between the parties ruptured in October 2003. The subject action was filed April 19, 2004, and tried on July 19 and 20, 2005. There was no expert testimony.

On cross-examination, Andrea acknowledged that, prior to the rupture, Kaelyn and Maureen had carried on a correspondence. The following colloquy then took place:

"Q  So, tell the Court what did you tell your daughter when you just cut her grandparents out of their life, what did you tell her?

"A I didn't say anything.

"Q   Just didn't talk about it?

"A Right.

"Q  She never asked you one question about your parents, that's what you told me at the deposition?

"A She has not.

"Q  You're under oath.  Not a single question?

"A No, we have not talked about it.  We have not talked about it.

"Q  How do you answer that?

"A She has not asked me anything.

"Q  Nothing?

"A Nothing, no.

"Q  You think that's a healthy thing for her?

"A I don't know if it's healthy."

Focusing on the status of the Maureen–Kaelyn correspondence following the rupture, counsel for Grandparents asked Andrea:

"Q  Have your parents written her since the problem?

"A Yes.

"Q  What happens with those letters?

"A They were not letters, they would just send cards.

"Q  What would happen to them?

"A Because of the escalation and fighting, I thought it might be best if she not see them.

"Q  So, you hid them from her?

"A I didn't hide them from her.

"Q  What did you do with them.

"A I didn't give them to her.

"Q  What do you [do] with them?

"A I put them aside.

"Q  Just to obliterate them from her life?

"A What I'm trying to do is make more peace with everything, because she might start asking questions.  So, I'm keeping her out of it.  I am keeping her out of it at this point.  Because of the position we are in, I thought it would be best.  That was my opinion.

"Q You don't think an 8, 9 or 10–year–old child is able to understand when two people completely disappear out of her life? She has not asked you one question?

"A She really hasn't."

The circuit court delivered an oral opinion at the conclusion of the evidence. It found this testimony to be "credible" but "troubling." After explaining its legal reasoning, the court interwove a program of counseling with its visitation order.

Before describing the circuit court's rationale, it will be helpful to review *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), the background against which this case was argued in the circuit court and here.

### *Troxel*

*Troxel* involved a statute of the State of Washington which, in terms, permitted any person, at any time, to obtain court-ordered visitation if the court concluded that visitation was in the best interest of the child. The custodial parent, the mother, did not oppose entirely visitation by the grandparents, so long as it was limited to one short visit per month. *Troxel*, 530 U.S. at 61, 120 S.Ct. at 2057. The Washington Supreme Court had held that the statute violated the United States Constitution by infringing on the fundamental right of parents to rear their children. *Id.* at 63, 120 S.Ct. at 2058. In the United States Supreme Court, four justices joined in the opinion announcing judgment, there were two separate concurrences, and three justices dissented. The Court affirmed, but for reasons different from those given by the Supreme Court of Washington.

The plurality, describing the operation of the Washington statute, said that "[o]nce the visitation petition has been filed in court and the matter is placed before a judge, a parent's decision that visitation would not be in the child's best interest is accorded no deference." *Id.* at 67, 120 S.Ct. at 2061. By placing the best interest determination solely in the hands of the judge, the Court said that,

"in practical effect, in the State of Washington a court can disregard and overturn *any* decision by a fit custodial parent concerning visitation ... based solely on the judge's determination of the child's best interests."

*Id.* This decisional framework that had been employed by the Washington State trial court "directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child." *Id.* at 69, 120 S.Ct. at 2062. Setting forth the appropriate decisional framework, the Court said:

"[T]he decision whether such an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance. And, if a fit parent's decision of the kind at issue here becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination."

*Id.* at 70, 120 S.Ct. at 2062. Accordingly, the Court held that the Washington statute had been unconstitutionally applied to the parent.

The Court expressly declined to pass on whether "the Due Process Clause require[d] all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation." *Id.* at 73, 120 S.Ct. at 2064. Nor would the Court define "the precise scope of the parental due process right in the visitation context." *Id.* After recognizing that non-parental visitation cases are adjudicated on a case-by-case basis, the Court said that it "would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a *per se* matter." *Id.* (footnote omitted). The Court then cited, for the sake of an example, *Fairbanks v. McCarter,* 330 Md. 39, 49–50, 622 A.2d 121, 126–27 (1993), where illustrations of the factors to be considered under the Maryland statute were set forth.[1]

---

4.  The passage from *Fairbanks* referred to in *Troxel* reads:

"[T]he court should assess in their totality all relevant factors and circumstances pertaining to the grandchild's best interests. These would include, but not be limited to: the nature and stability of the child's relationships with its parents; the nature and substantiality of

The plurality in *Troxel* also expressed agreement with one aspect of the dissenting opinion of Justice Kennedy, namely that

> "the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied and that the constitutional protections in this area are best 'elaborated with care.' [530 U.S. at 101, 120 S.Ct. at 2079.] Because much state-court adjudication in this context occurs on a case-by-case basis, we would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a *per se* matter."

*Id.* at 73, 120 S.Ct. at 2064. The Court then set forth in a footnote references to the statutes of all fifty states providing for grandparent visitation in some form.

### The Circuit Court's Opinion

The circuit court stated that grandparent visitation cases are very fact specific, so that the trial court is required to look at the totality of the circumstances. It noted the discretionary phraseology of the Maryland GVS, its requirement for finding that visitation is in the best interest of the child, and the non-exclusive factors set forth in *Fairbanks*.

Directing its attention to *Troxel*, the court said: "In looking at the presumptions and what *Troxel* did, it clearly did change the law in this area in terms of laying out what the trial court, such as myself, has to look at." The circuit court considered that *Troxel*

> "clearly says . . . that parents do have certain rights to control what happens to their children, but it is not an unfettered right. There's a presumption . . . that does exist

---

the relationship between the child and the grandparent, taking into account frequency of contact, regularity of contact, and amount of time spent together; the potential benefits and detriments to the child in granting the visitation order; the effect, if any, grandparental visitation would have on the child's attachment to its nuclear family; the physical and emotional health of the adults involved; and the stability of the child's living and schooling arrangements."
*Fairbanks,* 330 Md. at 50, 622 A.2d at 126–27.

as parents basically being deemed to know what is in their children's best interest, but as I said, that's not an absolute mandate that this Court then has to say just because the parents say it's so, they are presumed to be a hundred percent correct, and that could not be challenged."

The trial judge further opined that in order for the Grand-parents to get visitation

"two things have to happen. First off, the evidence has to be sufficient by a preponderance of the evidence to rebut the presumption that the parents have the best interest of the children at heart and are doing this out of the best interest as opposed to any other issue."

If the presumption were rebutted, then the second step would be for the court to consider the factors bearing on a best interest analysis.

The court concluded that the Grandparents had produced sufficient evidence to rebut the presumption. In particular, the court found that

"it was very clear to this Court over the years these Children were part of the Hainings' life on a fairly regular basis[,] more so frankly than the Court has seen in some grandparent cases.

"So, this was not a case of grandparent showing up five years after the child was born saying I want to see the children every month. There was a relationship, *the relationship stopped abruptly, not because of anything relating to the children,* but clearly because of a deterioration in the relationship between the Hainings and the Koshkos unfortunately over this incident in October."

(Emphasis added).

The court characterized the Grandparents' communications seeking reconciliation, to which no response was received, as utilizing "everything short of the Pony Express." Further distinguishing the instant matter from *Troxel,* the court noted that the position of Parents was that there would be "absolutely no visitation" by the Grandparents.

The circuit court concluded that it was in the best interests of the Children for there to be some limited visitation with Grandparents, but that, because of the October 2003 rupture, counseling was required. The court ordered the parties to attend four counseling sessions, within thirty days of each other, beginning within fourteen days from the decree. Grandparents were awarded one visitation in every forty-five day period, for four hours on Sunday afternoon. After the four counseling sessions, one overnight visitation per calendar quarter was substituted for one of the four hour visits.[5]

Parents timely appealed.

## Questions Presented

In this Court, Parents raise the following issues:

"I. Whether [FL § 9–102] is constitutional under the due process clause of the Fourteenth Amendment.

"II. Whether the lower court unconstitutionally applied [FL § 9–102] in granting visitation of the minor children to [the] Grandparents.

"III. Whether the lower court erred in giving greater weight to [the Grandparents'] evidence than [the Parents']."

## Discussion

Maryland's first grandparent visitation statute was enacted by Chapter 276 of the Acts of 1981. As amended through Chapter 247 of the Acts of 1991, the statute, then codified as Maryland Code (1984, 1991 Repl.Vol.), § 9–102 of the Family Law Article, provided:

"At any time after the termination of a marriage by divorce, annulment, or death, an equity court may:

---

5. The circuit court's order also requires the Grandparents to receive training in the use of the type of insulin pump utilized by Haley. Haley has had diabetes since infancy. Parents had considered Grandparents competent to care for Haley during the child-only overnights in Middleton preceding the October 2003 rupture. Subsequently, Haley has been medicated through an insulin pump.

"(1) consider a petition for reasonable visitation by a grandparent of a natural or adopted child of the parties whose marriage has been terminated; and

"(2) if the court finds it to be in the best interests of the child, grant visitation rights to the grandparent."

By Chapter 252 of the Acts of 1993, FL § 9–102 was amended to its present form:

"An equity court may:

"(1) consider a petition for reasonable visitation of a grandchild by a grandparent; and

"(2) if the court finds it to be in the best interests of the child, grant visitation rights to the grandparent."

In allowing court-ordered visitation where the marriage of the parents is intact, FL § 9–102 is like the GVSs of other states.[6]

## I.

■ The Parents argue that FL § 9–102, on its face, is unconstitutional under the Fourteenth Amendment's Due Process Clause. Citing *Troxel*, they contend that the statute is overly broad because it fails to "contain language that a fit parent is presumed to make decisions in the best interest of

---

**6.** Alaska Stat. § 25.20.065 (LEXIS L. Publg. WESTLAW through 2005 Legis. Sess.); Cal. Fam.Code Ann. § 3103 (West 2004); Idaho Code § 32–719 (WESTLAW through 2005 Legis. Sess.); Ky.Rev.Stat. Ann. § 405.021 (2003); Me.Rev.Stat. Ann. tit. 19–A, § 1803 (WESTLAW through 2005 Legis. Sess.); Mont.Code Ann. § 40–9–102 (WESTLAW through 2005 Reg. Sess.); N.D. Cent.Code § 14–09–05.1 (WESTLAW through 2005 Reg. Sess.); R.I. Gen. Laws § 15–5–24.3 (WESTLAW through January 2005 Legis. Sess.); S.D. Codified Laws § 25–4–52 (Michie 2004); Utah Code Ann. § 30–5–2 (2005); W. Va.Code §§ 48–10–301, 48–10–502 (2001); Wis. Stat. § 767.245 (2001); Wyo. Stat. Ann. § 20–7–101 (WESTLAW through 2005 Reg. Sess.).

Some state statutes do not give grandparents standing to sue for visitation against the wishes of the parents if the child lives in his or her intact nuclear family. *See* Ariz.Rev.Stat. § 25–409 (2003); Colo.Rev. Stat. § 19–1–117 (WESTLAW through 2005 Reg. Sess.); Ga.Code Ann. § 19–7–3 (WESTLAW through 2005 Spec. Sess.); Mass. Gen. Laws ch. 119 § 39D (2003); Neb.Rev.Stat. § 43–1802 (WESTLAW through 2005 First Reg. Sess.); Nev.Rev.Stat. 125C.050 (WESTLAW through 2005).

their [*sic* ] child and that a court must give special weight to that presumption." Parents submit that Maryland's GVS "incorrectly promulgates the 'best interest of the child' standard as the sole standard for determining third-party rights of visitation." Brief of Appellants at 5–6.

It is axiomatic that statutes carry a strong presumption of constitutionality. *Edgewood Nursing Home v. Maxwell,* 282 Md. 422, 427, 384 A.2d 748, 751 (1978); *City of Baltimore v. Charles Center Parking, Inc.,* 259 Md. 595, 598, 271 A.2d 144, 145 (1970); *Atkinson v. Sapperstein,* 191 Md. 301, 315, 60 A.2d 737, 742 (1948). Further, statutes "will be construed so as to avoid a conflict with the Constitution whenever that course is reasonably possible." *In re James D.,* 295 Md. 314, 327, 455 A.2d 966, 972 (1983) (citing *Deems v. Western Maryland Ry.,* 247 Md. 95, 113, 231 A.2d 514, 524 (1967)); *Williams & Fulwood v. Director,* 276 Md. 272, 295, 347 A.2d 179, 191 (1975). Moreover, to succeed on a facial challenge, a party "must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697, 707 (1987).

Maryland courts have interpreted statutes, broad on their face, to include limitations consistent with the United States Constitution, in an effort to uphold legislative intent to the extent reasonably possible, where the statute is challenged as facially unconstitutional. *See Becker v. State,* 363 Md. 77, 90–92, 767 A.2d 816, 823–24 (2001) (construing a drug nuisance abatement statute which granted authority to order "equitable relief" as not allowing the destruction of a building without providing compensation to the owner, so as to avoid "serious questions" about the statute's constitutionality); *Schochet v. State,* 320 Md. 714, 725–35, 580 A.2d 176, 181–86 (1990) (construing statute criminalizing fellatio as not applicable to consensual, noncommercial heterosexual activity in the privacy of the home in order to avoid the "difficult" question of whether applying the statute to such activity was constitutional); *Sanza v. Maryland State Bd. of Censors,* 245 Md. 319,

341, 226 A.2d 317, 329 (1967) (construing a film censorship statute, broad on its face, to apply only to "films and views to be shown for an admission charge, except when shown by public associations or institutions which do not operate for profit," so as to bring the statute within federal constitutional limits set forth in prior United States Supreme Court decisions).

■ We have no difficulty in concluding that Maryland's GVS carries a presumption in favor of the parental decision. In doing so, we do not "inferentially manufacture additional components of the statute that do not exist." *Fairbanks,* 330 Md. at 47, 622 A.2d at 125. In a sense, unsupervised visitation is custody for a very limited time. In *Ross v. Pick,* 199 Md. 341, 351, 86 A.2d 463, 468 (1952), the Court said:

> "Where parents claim the custody of a child, there is a *prima facie* presumption that the child's welfare will be best subserved in the care and custody of its parents rather than in the custody of others, and the burden is then cast upon the parties opposing them to show the contrary."

The rationale for the presumption is that

> " 'the affection of a parent for a child is as strong and potent as any that springs from human relations and leads to desire and efforts to care properly for and raise the child, which are greater than another would be likely to display.' "

*Ross v. Hoffman,* 280 Md. 172, 178 n. 4, 372 A.2d 582, 587 n. 4 (1977) (quoting *Melton v. Connolly,* 219 Md. 184, 188, 148 A.2d 387, 389 (1959)).

The seminal case in the Court of Appeals on the construction of Maryland's GVS is *Fairbanks, supra,* where the dispute was over the extent of the visitation that the Grandparents should have. The Court held that "Grandparents are not obliged to support their claim by alleging and proving the existence of exceptional circumstances justifying [their] visitation." 330 Md. at 49, 622 A.2d at 126. Rather, "[t]he outcome ... lies within the sound discretion of the trial court, guided solely by the best interests of the grandchild." *Id.* There is nothing inconsistent in *Fairbanks* with application of a pre-

sumption that the parents' decision concerning visitation is in the best interest of their child.

Before *Troxel* was decided, this Court recognized that the United States Constitution, as interpreted in a long line of decisions by the Supreme Court of the United States upholding the fundamental right of parents to rear their children, required that the presumption be applied in visitation cases. *See Wolinski v. Browneller,* 115 Md.App. 285, 693 A.2d 30 (1997). That case involved a mother's objection to court-ordered overnight visitation with grandparents where the mother considered daytime visitation to be appropriate. Judge Davis, writing for this Court, said:

> "But proper regard for a parent's constitutional rights requires that the burden to produce testimony or other evidence discrediting a parent's proposed visitation schedule be placed upon the grandparents who petition for vested visitation rights. Simply to ignore a parent's wishes regarding the time his or her child should spend outside the family home, and outside of his or her immediate care and custody, is to trample improperly on the parent's liberty interest in directing the upbringing of his or her child. Nevertheless, in light of the State's compelling interest in protecting the child's welfare and the minimal severity of the intrusion upon parental rights, the presumption in favor of appellant's schedule may be rebutted by affirmative evidence that the schedule would be detrimental to the child's best interests."

*Id.* at 319, 693 A.2d at 46. The absence of any reference in Maryland's GVS to a presumption did not impede recognition of the presumption as a constitutional requirement.

About one month after *Troxel* was decided, this Court decided *Brice v. Brice,* 133 Md.App. 302, 754 A.2d 1132 (2000). *Brice* was an appeal by a mother who was aggrieved that the circuit court had ordered grandparent visitation in excess of the schedule that the mother considered to be in the child's best interest. Finding no distinction between *Brice* and *Troxel,* this Court reversed.

A widower, who objected to the extent of court-ordered visitation between his children and their maternal grandmother, appealed in *Herrick v. Wain,* 154 Md.App. 222, 838 A.2d 1263 (2003). The father contended that Maryland's GVS was unconstitutionally broad and that the trial court had erred by failing to apply the presumption in favor of the father's decision to limit visitation. This Court affirmed. After reviewing the evidence, we found it sufficient to rebut the presumption that the father's decision was in the child's best interest, *id.* at 240, 838 A.2d at 1273, and that the *Fairbanks* criteria, see n. 2, *supra,* "ensure[d] a proper analysis of a grandparent visitation case beyond that which impermissibly occurred in *Troxel." Id.* at 236, 838 A.2d 1263, 838 A.2d at 1271.

The post-*Troxel* case of *In re Tamara R.,* 136 Md.App. 236, 764 A.2d 844 (2000), addressed a parent's objection, on constitutional grounds, to any court-ordered visitation by his daughter with her siblings. The issue arose in a CINA case where a juvenile master recommended sibling visitation. When the father argued on exceptions that he opposed any visitation, and that ordering visitation over his objection would violate his constitutional right to raise his children as he saw fit, the circuit court agreed. This Court reversed and remanded. After reviewing *Fairbanks, Troxel,* and *Wolinski,* this Court concluded as follows:

> "[W]e are faced with the issue of whether Mr. R.'s opposition to visitation is entitled to a presumption that denial of visitation is in the best interests of the children over whom he has custody. We think *Troxel* compels the court to apply a rebuttable presumption in favor of parents who oppose a non-parent's petition for visitation with their custodial children. *See Troxel,* 120 S.Ct. at 2063–64. By deciding that Mr. R.'s constitutional rights were violated without considering the evidence other than Mr. R.'s opposition to visitation, the trial court effectively created an irrebuttable presumption that visitation was not in the best interests of the children. In doing so, it erred. If there was sufficient evidence to rebut the presumption that visitation was in the

children's best interests, then we must reverse and remand for the court to consider that evidence in making its determination."

*Id.* at 253–54, 764 A.2d 844, 764 A.2d at 853.

In the Court of Appeals, the pre-*Troxel* case of *Maner v. Stephenson*, 342 Md. 461, 677 A.2d 560 (1996), involved a petition for grandparent visitation against the wishes of both parents in an intact nuclear family. The trial court, under a best interest analysis, concluded that there should be no visitation. The grandparents contended on appeal that the circuit court had "improperly deferred" to the parents' wishes, "thereby imposing a higher burden of proof on the [grandparents]." *Id.* at 466, 677 A.2d at 562. The grandparents also contended for a rebuttable presumption that visitation with them was in the grandchildren's best interests. The Court of Appeals affirmed, rejecting the notion that there was a presumption in favor of grandparental visitation.

A visitation issue was presented more recently to the Court of Appeals in *Fruse v. Barnhart*, 379 Md. 100, 840 A.2d 114 (2003). The appellant in that case was the mother of three children who had been placed with foster caregivers by the appellant's mother while appellant was incarcerated. The appellees took two of the children, Brett and Justin. On the appellant's release, the appellees returned Brett to the appellant, but not Justin. Within days thereafter, the appellees sought court-ordered custody of Brett. The trial court found the appellant to be a fit mother and awarded custody of Brett to her, but, in addition, established certain conditions which the Court of Appeals found to be illegal. Among these was that visitation between Brett and Justin take place at the appellees' home, without the third child being present. The appellant wanted visitation at her home, with the third child present. In resolution of that, and other more complex issues in the *Frase* case, the Court of Appeals reviewed *Troxel.* It considered that the plurality opinion in *Troxel* applied "the presumption that fit parents act in the best interest of their children," so that " 'there will normally be no reason for the State to interject itself into the private realm of the family to

further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.'" *Id.* at 123, 840 A.2d 114, 840 A.2d at 127–28 (quoting *Troxel,* 530 U.S. at 69, 120 S.Ct. at 2061). The error by the trial court in its visitation order was that "[n]o deference was given to [appellant's] view." *Id.* at 125, 840 A.2d at 128.

Following *Troxel,* some state courts have upheld statutes similar to Maryland's by judicially grafting the presumption required by *Troxel* to the statute. See *Kansas Dep't of Soc., Rehabilitation Servs. v. Paillet,* 270 Kan. 646, 16 P.3d 962, 967–69 (2001) (finding statute unconstitutional as applied because trial court failed to apply a presumption that the fit mother's decision to withhold visitation was in the best interest of the child); *Morgan v. Grzesik,* 287 A.D.2d 150, 732 N.Y.S.2d 773, 776 (2001) (holding statute facially constitutional because circumstances to be examined under best interest test included the parents' objection and the extent of the grandparent-grandchild relationship); *Harrold v. Collier,* 107 Ohio St.3d 44, 836 N.E.2d 1165, 1172 (2005) (holding "trial court misinterpreted *Troxel* as requiring courts to find 'overwhelmingly clear circumstances' to support forcing visitation for the benefit of the child over the opposition of the parent"); *Currey v. Currey,* 650 N.W.2d 273, 277 (S.D.2002) (placing burden of proof on grandparents so as to avoid unconstitutionality); *In re the Paternity of Roger D.H.,* 250 Wis.2d 747, 641 N.W.2d 440, 444–45 (2002) (*"Troxel* strongly suggests that we may read such a requirement into the statute to save it from facial invalidation.").

Some states require clear and convincing evidence that visitation is in the child's best interest to rebut the presumption. *See Evans v. McTaggart,* 88 P.3d 1078, 1090 (Alaska 2004) (remanding to "determine by clear and convincing evidence whether it is in the best interests of [the grandchild] that visitation with the [grandparents] be provided"); *Vibbert v. Vibbert,* 144 S.W.3d 292, 295 (Ky.Ct.App.2004) ("[G]randparent[s] seeking visitation must prove, by clear and convincing evidence, that the requested visitation is in the best interest of

the child."). Here, Parents do not contend that there must be an enhanced burden of persuasion.[7]

In *In re the Interest of T.A.*, 30 Kan.App.2d 30, 38 P.3d 140, 143–44 (2001), the court concluded that, "[a]bsent findings of *unreasonableness*, a trial court should adopt the grandparent visitation plan proposed by a fit parent."

An illustration of statutory language precluding a court from construing a GVS as according special weight to parental opposition to visitation is found in *DeRose v. DeRose*, 469 Mich. 320, 666 N.W.2d 636, 643 (2003). The court reasoned that the text of the statute provided "no indication that the statute requires deference of any sort be paid by a trial court to the decisions fit parents make for their children." *Id.* Further, the statute

> "indicates that the court is only required to make a record of the reasons for its decision in a grandparenting visitation case if visitation is *denied.* Apparently, if visitation is granted, the trial court need not justify its decision with any factual findings or analysis. Thus, rather than giving any 'special weight' to the determination of a fit parent, the thrust of this provision appears to favor grandparent visitation in the face of a contrary preference by a fit parent."

*Id.* at 643 n. 9.

In sum, this Court has concluded that the fundamental right of parents to raise their children, as applied to grandparent visitation in *Troxel,* is honored by a presumption that the parents' decision is in the best interests of the children. No decision of the Court of Appeals has held that, even after applying that presumption, the GVS infringes in all cases on the constitutional right. Accordingly, we hold that FL § 9–

---

**7.** *Shurupoff v. Vockroth,* 372 Md. 639, 814 A.2d 543 (2003), held that a clear and convincing standard is not required in a child custody dispute between parents and grandparents. *A fortiori,* that standard would not seem to be required in a grandparents-parents visitation case. In any event, the Parents have not briefed an argument that a clear and convincing argument applies here. See Maryland Rule 8–504(a)(5).

102 is not facially unconstitutional for failure expressly to articulate the presumption.

## II.

■ Alternatively, Parents contend that the trial court unconstitutionally applied the GVS because it utilized only a best interest analysis, without first finding that there were exceptional circumstances militating in favor of grandparental visitation. The argument rests almost entirely on *McDermott v. Dougherty*, 385 Md. 320, 869 A.2d 751 (2005). We disagree. Our explanation requires a background review.

*Fairbanks* expressly held that, under FL § 9–102, "[g]randparents are not obliged to support their claim by alleging and proving the existence of exceptional circumstances justifying such visitation." 330 Md. at 49, 622 A.2d at 126. In so holding, the Court of Appeals disapproved dicta to the contrary in *Skeens v. Paterno*, 60 Md.App. 48, 61, 480 A.2d 820, 826 (1984). *Fairbanks*, 330 Md. at 48, 622 A.2d at 126. This Court, despite having recognized, pre-*Troxel*, the constitutional foundation of the presumption that parents' decisions are in children's best interests, concluded that visitation rights could be awarded to grandparents over the parents' objections "even in the absence of exceptional circumstances," because the intrusion on parental autonomy is minimal. *Wolinski*, 115 Md.App. at 312, 693 A.2d at 43. *Herrick*, 154 Md.App. 222, 838 A.2d 1263, sustained an award of grandparent visitation on a best interest analysis, after applying the presumption in favor of the parental decision, but without requiring the trial court first to have found extraordinary circumstances to rebut the presumption.

Parents' position in the instant case is that *McDermott*, read in conjunction with *Troxel*, has overruled *Fairbanks*, *Wolinski*, and *Herrick* by necessary implication. Phrased another way, Parents submit that the GVS is unconstitutionally applied if visitation is awarded contrary to the Parents' decision, unless the court first finds extraordinary circumstances.

In *McDermott,* custody was transferred by the trial court from the child's father to his maternal grandparents, over the objection of the father. Under the rule of *Ross v. Hoffman,* 280 Md. 172, 372 A.2d 582 (1977), exceptional circumstances are required to award custody to a third party over the objection of a custodial parent or parents. In *Shurupoff,* 372 Md. 639, 814 A.2d 543, the Court, with one judge concurring only in the result, affirmed the award of custody to grandparents over the objection of the child's father. The Court in *Shurupoff* undertook to clarify a sentence in *Hoffman* where the Court had said:

> " 'Therefore, in parent-third party disputes over custody, it is only upon a determination by the equity court that the parent is unfit or that there are exceptional circumstances which make custody in the parent detrimental to the best interest of the child, that the court need inquire into the best interest of the child in order to make a proper custodial disposition.' "

*Shurupoff,* 372 Md. at 661, 814 A.2d at 557 (quoting *Hoffman,* 280 Md. at 179, 372 A.2d at 587). The *Shurupoff* Court explained that

> "[t]he last sentence that we quoted from [*Hoffman* ] was simply intended to make clear that, because of the presumption, a parent and a third party do not stand on an equal footing, and that, before the third party may be granted custody, he or she must rebut the presumption in one of the manners indicated."

*Id.* at 662, 814 A.2d at 557.

The Court revisited that aspect of *Shurupoff* in *McDermott.* There, in a 112 page opinion, the Court reviewed cases from throughout the country with the view of determining whether a finding of exceptional circumstances was a threshold requirement before applying a best interest analysis, in determining whether custody could be transferred from a fit parent to a third party in a private custody dispute. The Court

concluded that was the majority view and applied it to the facts in *McDermott.*

Specifically, the Court in *McDermott* held the following:

"In respect to third-party custody disputes, we shall adopt for Maryland, if we have not already done so, the majority position. In the balancing of court-created or statutorily-created 'standards,' such as 'the best interest of the child' test, with fundamental constitutional rights, in private custody actions involving private third-parties where the parents are fit, absent extraordinary (*i.e.,* exceptional) circumstances, the constitutional right is the ultimate determinative factor; and only if the parents are unfit or extraordinary circumstances exist is the 'best interest of the child' test to be considered, any contrary comment in *Shurupoff,* or other of our cases, notwithstanding."

385 Md. at 418–19, 869 A.2d at 808–09. The Court concluded that the periodic absences from the state by the father, due to his occupation as a merchant seaman, did not constitute extraordinary circumstances, where the father had arranged suitable and safe alternative care for the child during those absences.

The *McDermott* Court did not limit its review, however, exclusively to cases dealing with custody disputes between fit parents and third parties. *Troxel* was reviewed, 385 Md. at 349, 869 A.2d at 767–68, as part of a restatement of Supreme Court decisions dealing with the constitutional right of parents to raise their children. Also interspersed among state court decisions discussed in *McDermott* are five visitation cases.

*McDermott,* 385 Md. at 383–84, 869 A.2d at 788, cited *Rideout v. Riendeau,* 761 A.2d 291 (Me.2000), a post-*Troxel* case in which the Supreme Judicial Court of Maine sustained the constitutionality, as applied, of that state's GVS. *McDermott* emphasized the *Rideout* court's statement that "the best interests of the child standard, standing alone, is an insufficient standard for determining when the state may intervene in the decision making of competent parents." *McDermott,* 385 Md. at 383, 869 A.2d at 788 (quoting *Rideout,* 761 A.2d at

297) (italics omitted). The *Rideout* court approved visitation in that case largely because the petitioning grandparents had acted as parents for the children for a number of years and because the statute required that the trial court give consideration to the parents' objection to visitation, "thus preventing the court from intervening in a fit parent's decision[-]making simply on a best interests basis." 761 A.2d at 303.

*Hoff v. Berg*, 595 N.W.2d 285 (N.D.1999), a pre-*Troxel* case, is cited in *McDermott*, 385 Md. at 395–96, 869 A.2d at 795. There, the Supreme Court of North Dakota held that state's GVS to be facially unconstitutional because it expressly required that visitation rights be awarded to grandparents of an unmarried minor unless the trial court found that visitation would not be in the best interest of the minor. This shifting of the burden of proof violated the parents' fundamental liberty interest. 595 N.W.2d at 291–92.

*McDermott*, 385 Md. at 412–13, 869 A.2d at 805, cites *Griffin v. Griffin*, 41 Va.App. 77, 581 S.E.2d 899 (2003), where Virginia's intermediate appellate court reversed an award of visitation to a man who was the estranged husband of the child's mother, but who was not the biological father of the child. *Griffin* applied *Williams v. Williams*, 256 Va. 19, 501 S.E.2d 417 (1998), a decision in which the Virginia Supreme Court held that " 'a court must find an actual harm to the child's health or welfare without such visitation.' " *Id.* at 418 (citing *Williams v. Williams*, 24 Va.App. 778, 485 S.E.2d 651, 654 (1997)). *Williams* was cited by the plurality in *Troxel* as an obvious counterbalance to Maryland's *Fairbanks*, in that portion of the opinion where the United States Supreme Court found it unnecessary to decide whether a finding of harm constitutionally was required "as a condition precedent to granting visitation." *Troxel*, 530 U.S. at 73, 120 S.Ct. at 2064.

A pre-Troxel grandparents' visitation decision, *Beagle v. Beagle*, 678 So.2d 1271 (Fla.1996), is also cited in *McDermott*, 385 Md. at 413–14, 869 A.2d at 805–06. The Florida court held that, under Article I, § 23, Fla. Const., a "strong privacy provision," 678 So.2d at 1275, "the State may not intrude upon

the parents' fundamental right to raise their children except in cases where the child is threatened with harm." *Id.* at 1276. *McDermott* noted, 385 Md. at 414, 869 A.2d at 806, that the Florida Supreme Court had favorably cited *Hawk v. Hawk*, 855 S.W.2d 573 (Tenn.1993), in which the court had held that Tennessee's GVS had been applied in violation of the privacy provision of that state's constitution, where no harm to the grandchildren had been demonstrated.

The remaining visitation case cited in *McDermott*, 385 Md. at 414, 869 A.2d at 806, is *Brooks v. Parkerson*, 265 Ga. 189, 454 S.E.2d 769 (1995), *cert. denied*, 516 U.S. 942, 116 S.Ct. 377, 133 L.Ed.2d 301 (1995). The Georgia GVS in part provided that " 'the court may grant any grandparent of the child reasonable visitation rights upon proof of special circumstances which make such visitation rights necessary to the best interests of the child.' " 454 S.E.2d at 771. The court invalidated this statute under both the Fourteenth Amendment and the due process clause of the Georgia Constitution. There was "insufficient evidence that supports the proposition that grandparents' visitation with their grandchildren always promotes the children's health or welfare." *Id.* at 773. Further, the "state may only impose that visitation over the parents' objections on a showing that failing to do so would be harmful to the child." *Id.*

Other grandparent visitation cases requiring a showing of harm to the child in order to rebut the presumption that the parents' decision is in the child's best interest are *In the Matter of R.A. & T.A.*, 121 P.3d 295, 299 (Colo.App.2005), *cert. granted* by Colorado Supreme Court; *Roth v. Weston*, 259 Conn. 202, 789 A.2d 431, 450 (2002); *Crockett v. Pastore*, 259 Conn. 240, 789 A.2d 453, 457 (2002) (requiring, in addition to real and significant harm to child, a parent-like relationship between grandparent and grandchild); *Moriarty v. Bradt*, 177 N.J. 84, 827 A.2d 203, 222 (2003); and *Camburn v. Smith*, 355 S.C. 574, 586 S.E.2d 565, 568 (2003).

In *Moriarty,* the court explained what it meant by "harm."

"Thus, in every case in which visitation is denied, the grandparents bear the burden of establishing by a preponderance of the evidence that visitation is necessary to avoid harm to the child. The grandparents' evidence can be expert or factual. For example, they may rely on the death of a parent or the breakup of the child's home through divorce or separation.... In addition, the termination of a long-standing relationship between the grandparents and the child, with expert testimony assessing the effect of those circumstances, could form the basis for a finding of harm. *See, e.g., Roth,* 789 A.2d at 445 (noting that proof of substantial, emotional ties between child and nonparent could result in harm to child if contact with that person is denied or curtailed); *Blixt* [*v. Blixt* ], [437 Mass. 649], 774 N.E.2d [1052] 1060 [(2002)] (observing that '[t]he requirement of significant harm presupposes proof of a showing of a significant preexisting relationship between the grandparent and the child'). ·The possibilities are as varied as the factual scenarios presented.

"If the court agrees that the potential for harm has been shown, the presumption in favor of parental decision making will be deemed overcome. At that point, the parent must offer a visitation schedule. If the grandparents are satisfied, that will be the end of the inquiry. If not, a second step will be undertaken—an assessment of the schedule. The presumption in favor of parental decision making having been overcome, the court should approve a schedule that it finds is in the child's best interest[.]"

827 A.2d at 223–24.

Post-*Troxel,* grandparent visitation cases which do not require a showing of harm to the child include *Vibbert,* 144 S.W.3d 292 (overruling prior decision requiring harm and holding constitutionally sufficient presumption that fit parents' decision is in child's best interest, coupled with clear and convincing evidence standard); *Zeman v. Stanford,* 789 So.2d 798, 804 (Miss.2001) (holding that multiple factors in best interest analysis, including " 'willingness of the grandparents to accept that the rearing of the child is the responsibility of

the parent,'" ensured that parental fundamental right would not be infringed); *Morgan,* 287 A.D.2d 150, 732 N.Y.S.2d 773, 778 (holding that giving parents' "decision some presumptive or 'special' weight, ... is all that *Troxel* requires"); *Harold,* 107 Ohio St.3d 44, 836 N.E.2d 1165, 1172 (holding statutorily enumerated, *Fairbanks*-like factors placed on grandparents "the burden of proving that visitation would be in the best interest of [the child], thereby honoring the traditional presumption that a fit parent acts in the best interest of his or her child"); *In re Paternity of Roger D.H.,* 250 Wis.2d 747, 641 N.W.2d 440 (best interest test with presumption, held constitutional); *Brandon L. v. Moats,* 209 W.Va. 752, 551 S.E.2d 674 (2001) (*Fairbanks*-like factors, statutorily enumerated, including parent preference, constitutionally sufficient).

Against the foregoing background, we list the reasons causing us not to accept Parents' argument that grandparents must first show harm to their grandchildren from the parents' decision concerning visitation, before the trial court can determine whether visitation should be awarded.

—The directly controlling precedent in this State, *Fairbanks,* held that exceptional circumstances (which would include harm to the children) are not required in order to award visitation under the GVS.

—In accordance with the rule in *Fairbanks,* this Court, in *Wolinski, In re Tamara R.,* and *Herrick,* has not required exceptional circumstances as a prerequisite to grandparent visitation.

—*McDermott* is a custody holding. Indeed, in a footnote responding to the concurring opinion, the majority in *McDermott* stated: "The Court has gone to great lengths to affirm that the present opinion is limited to the context of attempts by pure third parties to gain custody over the children of others." 385 Md. at 435–36 n. 49, 869 A.2d at 819 n. 49.

—A holding concerning custody (*McDermott*) is not a directly controlling precedent concerning visitation (*Fairbanks*) because the intrusions on parental rights are not comparable. "[T]he respective proceedings for termination of parental

rights/adoption, custody, and visitation vary greatly in their degree of intrusiveness upon the liberty interests of the parents involved." *Wolinski*, 115 Md.App. at 305, 693 A.2d at 39. "[I]n light of the much lesser intrusion on parental rights of a modifiable custody order than a permanent TPR order, the private interest of the parent becomes far less 'commanding' than that which exists in TPR cases." *Shurupoff*, 372 Md. at 658, 814 A.2d at 555. Moving down the scale of values, "[v]isitation is a considerably less weighty matter than outright custody of a child[.]" *Fairbanks*, 330 Md. at 48, 622 A.2d at 126. When fully implemented after counseling, the visitation order in the case before us places the Children with the Grandparents approximately one percent of the time in a calendar quarter.

—We cannot purport to justify declaring, based on *Troxel,* that *Fairbanks* is no longer the law of Maryland when *Troxel* expressly declined to decide whether harm is a prerequisite to awarding visitation to grandparents over parental objection, and the Supreme Court cited *Fairbanks* as illustrative of one of the modes of analysis for determining visitation.

—Absent justification based on directly controlling Supreme Court authority, it is not, jurisprudentially, the function of a state intermediate appellate court to anticipate rulings by the United States Supreme Court in order to declare a decision of the state supreme court overruled by higher authority.

—It is not, jurisprudentially, the function of a state intermediate appellate court to declare a precedent of the state supreme court (*Fairbanks* ) impliedly overruled by a later decision of the state supreme court (*McDermott* ) that is not a direct precedent.

## III.

■ Parents' remaining contention is that the circuit court misapplied the presumption. They submit that, "[b]y using the best interest of the child standard to rebut the presumption, the lower court placed itself on equal footing with [the Parents]." Brief of Appellants at 19. Much the same argu-

ment is advanced when Parents assert that the circuit court gave "greater weight to the ... evidence of the [Grandparents] than that of the [Parents]." Brief of Appellants at 27.

The question presented is directed to the weight of the presumption. " '[A] parent's right to direct his or her child's upbringing is not absolute. Rather, Due Process analysis requires the delicate balancing of all of the competing interests involved in the litigation.' " *In re Yve S.,* 373 Md. 551, 569, 819 A.2d 1030, 1041 (2003) (quoting *Wolinski,* 115 Md.App. at 300, 693 A.2d at 37). A parent's fundamental interest in raising a child "is not absolute and does not exclude other important considerations." *In re Mark M.,* 365 Md. 687, 705, 782 A.2d 332, 343 (2001).

The presumption with which we are concerned here is an evidentiary presumption. In the instant matter, the Parents' fitness is not disputed. That fact gives rise to the presumption that the Parents' decision that there be no contact whatsoever between Grandparents and Children was "in the best interests of their children." *Troxel,* 530 U.S. at 68, 120 S.Ct. at 2061. Because, in the context of child rearing, the presumption operates to protect a fundamental constitutional right, the court reviewing a fit parent's decision concerning visitation "must accord at least some special weight to the parent's own determination." *Id.* at 70, 120 S.Ct. at 2062.

Here, Grandparents produced sufficient evidence from which the court found that the Children "were part of the Hainings' life on a fairly regular basis[.]" The Children "did definitely benefit from that relationship." The court further found the following:

"I understand that there's a lot of baggage that goes along with this family dating back to when Mrs. Koshko was a teenager or even earlier than that. However, the evidence has proven to this Court that in terms of the relationship with the grandchildren, I think efforts were made by both sides to their credit to keep some of that baggage in the background and foster a relationship with the grandchil-

dren, and I think that was done to the credit of both parties."

The Grandparents further proved, and the court found, that that relationship stopped, "clearly because of a deterioration in the relationship between the Hainings and the Koshkos unfortunately over this incident in October." The Hainings also proved, and the court found, that the relationship between them and the Children "stopped abruptly," but the Parents did not stop it "because of anything relating to the Children[.]" Thus, there was sufficient evidence to rebut the presumption.

Parents could have decided, tactically, at the end of the Grandparents' case, to rest entirely on the presumption, but they chose to put on a case. The principal witness for the Parents was Andrea, whose testimony extends over approximately 145 pages of transcript. At the conclusion of Andrea's examinations by counsel, the court asked her some questions, one of which was why it was her position that "it was in the best interest of their children not to ever see their grandparents again." In its oral opinion, the circuit court referred to Andrea's response, commenting that it "heard nothing" as to how the complete termination of visitation was in the best interests of the Children. The court also said that Andrea's response "was not persuasive." Parents point to these statements in the oral opinion as evidencing that the circuit court improperly shifted the burden to Parents to prove that termination of visitation was in the best interests of the Children. We think not. As the circuit court clearly stated, the Grandparents had already produced sufficient evidence to rebut the presumption, and the court's questioning was an obvious effort to give Parents a final opportunity to bolster the rebutted presumption for purposes of the weighing process on best interests.

The circuit court permissibly reached a best interest analysis and did not abuse its discretion in performing that analysis or in the extent of visitation ordered.

For all the foregoing reasons, we shall affirm.[8]

**JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANTS.**

---

**8.** Grandparents filed a motion contending that the Parents' record extract was inadequate. They sought dismissal or an order requiring Parents to advance the costs of the appendix of appellees. Our affirmance moots that motion.